Amanda TATRO, Relator,

v.

UNIVERSITY OF MINNESOTA, Respondent.

No. A10–1440.

Court of Appeals of Minnesota.

July 11, 2011.

---

Jordan S. Kushner, Minneapolis, MN, for relator.

Mark B. Rotenberg, University of Minnesota General Counsel, Tracy M. Smith, Associate General Counsel, Minneapolis, MN, for respondent.

Considered and decided by HALBROOKS, Presiding Judge; HUDSON, Judge; and BJORKMAN, Judge.

## OPINION

BJORKMAN, Judge.

Relator challenges respondent university's disciplinary sanctions, arguing that the university's imposition of sanctions was unauthorized, arbitrary, and violated her constitutional rights. Because we conclude

814

that the university properly exercised its authority to address relator's off-campus conduct and did not violate relator's free-speech right, and because the evidence supports the university's finding that relator violated university rules, we affirm.

## FACTS

Relator Amanda Tatro is a student in the mortuary-science program at respondent University of Minnesota. The program prepares students to become funeral directors or morticians, and includes laboratory courses in anatomy, embalming, and restorative art. The laboratory courses utilize cadavers donated through the university's anatomy-bequest program. Before taking the laboratory courses, Tatro participated in an orientation program that addressed appropriate conduct with respect to anatomy-bequest-program donors.[1] She signed a disclosure form indicating that she understood and agreed to abide by the program rules.

During November and early December 2009, Tatro posted the following on her Facebook page:

> **Amanda Beth Tatro** Gets to play, I mean dissect, Bernie[2] today. Lets see if I can have a lab void of reprimanding and having my scalpel taken away. Perhaps if I just hide it in my sleeve....

> **Amanda Beth Tatro** Is looking forward to Monday's embalming therapy as well as a rumored opportunity to aspirate. Give me room, lots of aggression to be taken out with a trocar.[3]

> **Amanda Beth Tatro** Who knew embalming lab was so cathartic! I still want to stab a certain someone in the throat with a trocar though.[4] Hmm...perhaps I will spend the evening updating my "Death List # 5" and making friends with the crematory guy. I do know the code....

> **Amanda Beth Tatro** Realized with great sadness that my best friend, Bernie, will no longer be with me as of Friday next week. I wish to accompany him to the retort. Now where will I go or who will I hang with when I need to gather my sanity? Bye, bye Bernie. Lock of hair in my pocket.

Tatro's Facebook settings allowed her "friends" and "friends of friends" to view these postings; Tatro acknowledges that this group includes hundreds of people.

On December 11, 2009, a mortuary-science student who also worked for the anatomy-bequest program reported concerns about Tatro's Facebook posts. On December 14, Michael Lubrant, director of the mortuary-science program, met with department faculty about the posts and notified the university police. Lubrant also informed Tatro that she was not to return to class until further notice. Tatro contacted the media in response. The police ultimately concluded that no crime had been committed, and Tatro was told she could return to class a few days later.

On December 29, the university's office for student conduct and academic integrity submitted a formal complaint against Ta-

1. "Donor" refers to the body of the deceased person.

2. "Bernie" was the name Tatro gave to the cadaver/donor she was assigned to work on, and is derived from the film *Weekend at Bernie's*.

3. A trocar is an instrument used during embalming that has a long hollow needle with a sharp end, used to aspirate fluids and gases out of the body.

4. Tatro testified at the Campus Committee on Student Behavior hearing that she was referring to a man who had just broken up with her. She indicated that they talked on Facebook and she "knew he was going to see it" and would know "it was about him."

tro, alleging violations of the university's student-conduct code. The complaint alleged Tatro engaged in threatening, harassing, or assaultive conduct, in violation of section V, subdivision 6, of the code, and that she violated subdivision 16 by engaging in conduct contrary to university rules related to the mortuary-science program, anatomy-laboratory course rules, and the rules listed on the anatomy-bequest-program disclosure form.

On March 25, 2010, a panel of the campus committee on student behavior (CCSB) held a hearing. Tatro's attorney challenged the committee's jurisdiction and requested a continuance, but the panel proceeded with the hearing. The panel heard testimony from Tatro and several other witnesses, including Lubrant; Angela McArthur, Tatro's professor for the anatomy-laboratory course; embalming-laboratory instructor Jody LaCourt; and another mortuary-science student.

On April 2, the CCSB issued a written decision finding Tatro responsible for the violations and imposing several sanctions, including giving Tatro a failing grade in her anatomy-laboratory class and requiring her to enroll in a clinical ethics course; write a letter to mortuary-science department faculty addressing the issue of respect within the department and profession; and complete a psychiatric evaluation. The CCSB also placed Tatro on academic probation for the remainder of her undergraduate career.

Tatro appealed the decision to the provost's appeal committee (PAC), which recommended that the CCSB's determinations and sanctions be upheld. The provost issued a final decision affirming the CCSB's findings and sanctions, em-

phasizing that Tatro's posts "were disrespectful, unprofessional, and reasonably interpreted as threatening." This certiorari appeal follows.

## ISSUES

I. Did the university have authority to conduct the disciplinary hearing?

II. Does evidence support the determination that Tatro violated university rules?

III. Did the university violate Tatro's constitutional rights?

IV. Did the university have authority to change one of Tatro's course grades as one of the disciplinary sanctions?

## ANALYSIS

Tatro challenges the university's consideration and imposition of disciplinary sanctions, arguing that the university's rules did not authorize the university to act and that its actions were arbitrary, lacked evidentiary support, and violated her constitutional right to free speech. She requests that we reverse, with instructions to the university to dismiss all charges, remove her from probation, expunge any record of discipline from her academic file, and restore her passing grade in her anatomy-laboratory course.[5]

Appellate courts generally defer to university decisions in student discipline matters. *Bailey v. Univ. of Minn.*, 290 Minn. 359, 360–61, 187 N.W.2d 702, 703–04 (1971); *see also Bd. of Regents v. Reid*, 522 N.W.2d 344, 346 (Minn.App.1994) (noting that as a "constitutional arm of Minnesota state government," the university occupies

---

5. Tatro also requests that costs and attorney fees be awarded "due to the violations of her constitutional rights pursuant to 42 U.S.C. § 1988." But this request is not properly before this court, as this appeal is not an "action or proceeding to enforce a provision" of the relevant laws listed under 42 U.S.C. § 1988(b) (2006).

a "unique position," and its governing body is "generally free of legislative, executive, or judicial interference as long as it properly executes its duties"), *review denied* (Minn. Oct. 27, 1994). And courts generally exercise great restraint in cases involving academic discipline that does not result in expulsion or suspension. *Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758*, 594 N.W.2d 216, 220 (Minn.App.1999), *review denied* (Minn. July 28, 1999). Accordingly, our review of a university decision is

> limited to an inspection of the record of the administrative tribunal, and this court is confined to questions affecting the regularity of the proceedings and, as to the merits of the controversy, whether the determination was arbitrary, oppressive, unreasonable, fraudulent, made under an erroneous theory of law, or without any evidence to support it.

*Chronopoulos v. Univ. of Minn.*, 520 N.W.2d 437, 441 (Minn.App.1994), *review denied* (Minn. Oct. 27, 1994). A university's decision may be arbitrary if the university violates its own procedures. *Ganguli v. Univ. of Minn.*, 512 N.W.2d 918, 923 (Minn.App.1994). Whether a party's constitutional rights have been violated is a question of constitutional interpretation, which this court reviews de novo. *Star Tribune Co. v. Univ. of Minn. Bd. of Regents*, 683 N.W.2d 274, 283 (Minn.2004).

## I. The university was authorized to conduct the disciplinary hearing.

Tatro first argues that the university's actions "exceeded the University's authority as proscribed by its own rules." The CCSB did not rule on this issue, but the PAC and provost rejected Tatro's lack-of-authority argument. Tatro contends that the university lacked authority because (1) the penalized conduct occurred off campus and (2) the student-conduct code does not authorize discipline for violating course-

specific rules. We address each argument in turn.

### A. Off-campus conduct

■ Tatro first argues that the student-conduct code does not apply to her off-campus conduct. Section II of the code provides:

> The Student Conduct Code (Code) shall apply to student conduct that occurs on University premises or at University-sponsored activities. At the discretion of the president or delegate, the Code also shall apply to off-campus student conduct when the conduct, as alleged, adversely affects a substantial University interest and either:
>
> (a) constitutes a criminal offense as defined by state or federal law, regardless of the existence or outcome of any criminal proceeding; or
>
> (b) indicates that the student may present a danger or threat to the health or safety of the student or others.

Tatro contends that she created her Facebook entries off campus and they were not related to a university-sponsored activity. Even accepting Tatro's contentions as true, the code expressly authorizes the university to apply the code to students whose alleged off-campus conduct has an adverse effect on a substantial university interest and indicates potential danger or threat to the student or others. *See* Code Section II(b). Tatro asserts that construing her posts as serious threats is "irrational and unreasonable," noting that the police concluded that no crime was committed. We are not persuaded.

Tatro's posts referenced, albeit anonymously, an anatomy-bequest program donor, spoke of taking out "aggression" in a university class, and mentioned wanting to "stab" an unidentified individual with a trocar. Whether or not Tatro intended her posts to be satire or mere venting does

not diminish the university's substantial interest in protecting the safety of its students and faculty and addressing potentially threatening conduct. Indeed, the realities of our time require that our schools and universities be vigilant in watching for and responding to student behavior that indicates a potential for violence. Accordingly, we reject Tatro's argument that the university lacked authority to initiate disciplinary proceedings because Tatro created the posts off campus.

### B. Violations of course rules

Tatro next argues that the university lacked authority to discipline her for violating rules contained within a course syllabus, contending that course-specific rules are not covered by the code. Section V of the code enumerates 17 disciplinary offenses. Subdivision 16 provides that a student is subject to discipline for "engaging in conduct that violates University, collegiate, or departmental regulations that have been posted or publicized, including provisions contained in University contracts with students."

■ The university argues that the laboratory-course rules that each mortuary-science student is required to review and acknowledge, in order to participate in laboratory courses, fall within subdivision 16. We agree. Tatro cites no legal or commonsense support for her narrow construction of subdivision 16, and such a construction would frustrate the very purpose of course-specific rules, which must necessarily address the unique considerations presented by a particular course or field of study. Further, Tatro does not dispute that she signed an agreement to follow the anatomy-laboratory, and the anatomy-bequest, program rules, which we construe as a contract with the university. On this record, we conclude that the university's determinations that the code ap-

plies and the challenged conduct is subject to discipline under the code are not arbitrary, legally erroneous, or unreasonable. *See Chronopoulos*, 520 N.W.2d at 441.

### II. Evidence supports the determinations that Tatro violated university rules.

Tatro next argues that the university improperly disciplined her because "[t]here is a lack of evidence in the record to support a finding that the specific language of any cited rule was violated." The university determined that Tatro committed two types of disciplinary offenses: engaging in threatening conduct and violating university rules. We consider whether the record contains evidentiary support for each of these determinations.

### A. Threatening conduct

The university concluded that Tatro's Facebook posts constituted threatening conduct, as defined in section V, subdivision 6 of the code. Subdivision 6 prohibits students from "engaging in conduct that endangers or threatens to endanger the health, safety, or welfare of another person, including, but not limited to, threatening, harassing, or assaultive, behavior." Tatro argues that the entries, "when read in context, were obviously literary expression, intended to be satirical, vent emotion, and incorporate popular culture references."

■ Tatro's argument is unavailing. Notwithstanding her attempts to minimize the effect of her posts, the record evidence demonstrates the impact the posts had on the students and faculty of the mortuary-science program. Several faculty members expressed personal concerns about whether the posts were directed toward them, especially Tatro's statement about wanting "to stab a certain someone in the throat with a trocar." Lubrant testified

that he believed Tatro was referring to him because of a recent conflict they had over her use of a faculty parking space. LaCourt, the professor of the laboratory class where trocars are used, was "visibly shaking" and "very upset" when she saw the posts. Tatro does not challenge the university's finding that she admitted that these statements were directed at a specific person outside the university.

Moreover, Tatro's assertion that her Facebook friends understood the cultural references and her "satirical" sense of humor is contradicted by the testimony of another mortuary-science-program student, who described the concern that other students expressed about the posts. Thus, while Tatro's arguments to this court may provide a context and explanation for the Facebook posts, they do not change the fact that the posts were reasonably viewed as threatening. The posts were not private statements; they were visible to hundreds of Facebook users, including students in the mortuary-science program. The context was not readily apparent, even to those who regularly associated with Tatro at the university. Considering the witness testimony on the record, we conclude that the evidence supports the university's determination that Tatro's posts constituted threatening conduct in violation of section V, subdivision 6, of the conduct code.

## B. University rules

The university also found that Tatro violated certain of the anatomy-laboratory rules, the mortuary-science student-conduct code, and the requirements set out in the anatomy-bequest-program disclosure form. These challenged violations fall within subdivision 16, prohibiting "conduct that violates University, collegiate, or departmental regulations that have been posted or publicized, including provisions contained in University contracts with students," and we address each in turn.

### 1. Anatomy-laboratory rules

The university found that Tatro violated rules 6 and 7 of the anatomy-laboratory course rules. Rule 6 states, "Human material should always be handled with the greatest respect. The body should be appropriately draped whenever possible." Rule 7 states, "Conversational language of cadaver dissection outside the laboratory should be respectful and discreet. Blogging about the anatomy lab or the cadaver dissection is not allowable." Tatro argues that the evidence does not support findings that she violated these laboratory rules.

First, Tatro asserts that rule 6 only applies to the physical handling of a cadaver or other human material and that the record is devoid of any evidence that she handled a cadaver improperly. We agree. There is no evidence that Tatro physically handled human material disrespectfully. The Facebook posts cannot be reasonably interpreted as "handling" of human material under rule 6. Accordingly, we conclude that the university's finding that Tatro violated rule 6 lacks evidentiary support.

Second, as to rule 7, Tatro focuses on the term "blogging," arguing that her Facebook posts do not fall within the definition of blogging and are thus not prohibited. But we do not need to decide this narrow question, because rule 7 broadly provides that "conversational language" about cadaver dissection that takes place outside of the laboratory "should be respectful and discreet." As the university asserts, public comments about "playing" with or taking "aggression" out on a cadaver are inconsistent with the notions of respect and dignity whether they occur in person, on Facebook, in a blog, or via other media. And Tatro acknowledged that she received the anatomy-laboratory rules, went through an extensive orienta-

tion, and understood that there are limitations to what she can post on Facebook. Accordingly, we conclude that the university's determination that Tatro's posts violated rule 7 is supported by the evidence.

### 2. Mortuary-science student-conduct code

■ The university also concluded that Tatro violated rules 1c and 2a of the mortuary-science student-conduct code. Rule 1c states, "Students shall carry out all aspects of the funeral service in a competent and respectful manner." Rule 2a states, "All deceased persons shall be treated with proper care and dignity during the transfer from the place of death and subsequent transportation of the remains." Tatro first argues that rule 1c only refers to the "funeral service," and that she did not engage in any prohibited conduct with respect to a memorial service. The university urges a broader definition of "funeral service," arguing that "[t]reatment of decedents with respect, proper care, and dignity is not limited to just a one-hour memorial service or the minutes during which the donor is in moving transit." We are not persuaded. While rule 1 encompasses "Service to Families," subdivision (c) clearly applies only in the limited context of funeral services. And we agree that Tatro's posts did not, in any meaningful way, implicate a funeral service.

Tatro next argues that rule 2a was "taken out of context" in the complaint without regard for the full provision.[6] She emphasizes that the rule, read in its entirety, specifically "applies to how deceased persons should be treated during transport." We agree. There is no record evidence that Tatro failed to treat a decedent with proper care and dignity during transport,

and the Facebook entries made no reference to transporting a decedent. Accordingly, we conclude that the university erred in finding Tatro violated rules 1c and 2a of the mortuary-science student-conduct code.

### 3. Anatomy-bequest-program disclosure form

Finally, the university found that Tatro violated rules outlined in her signed anatomy-bequest-program human-anatomy access-orientation disclosure form. Tatro argues that the university improperly used this form to find her in violation of "nonexistent rules."

■ We note that the form itself is not an explicit list of rules. Rather, the form is an acknowledgment of participation in the required human-anatomy access-orientation session and an indication that Tatro understood the policies and the overall responsibilities that the privilege of dissecting a human body "carries with it." From the disclosure form, it is evident that certain policies and rules regarding treating donors with respect and dignity were explained during the orientation. Accordingly, we conclude that the university appropriately referenced this form in determining that Tatro violated the overall policy requirement of treating donors with respect and dignity. The record evidence surrounding her Facebook posts supports this finding.

### III. The university's discipline did not violate Tatro's constitutional right to free speech.

Tatro contends that her Facebook posts were constitutionally protected "literary expressions," immune from discipline by the university. Tatro argues that her

---

6. Tatro also argues that the rules are "not applicable" because the university referenced a 2008–2009 policy handbook. This argu-

ment is without merit, as the policies did not change.

posts fall within the protection afforded by the First Amendment to the United States Constitution.

■ Student speech is afforded broad constitutional protection, and state colleges and universities "are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). But at the same time, the United States Supreme Court has recognized that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986), and the rights of students must be "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). In a long line of cases, beginning with *Tinker*, the Supreme Court has held that schools may limit or discipline student expression if school officials "reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse v. Frederick*, 551 U.S. 393, 403, 127 S.Ct. 2618, 2626, 168 L.Ed.2d 290 (2007) (quoting *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740).

In *Tinker*, two high-school students and one junior high-school student chose to violate their school's policies by wearing black armbands to school to protest the United States' involvement in Vietnam. 393 U.S. at 504, 89 S.Ct. at 735. The students were suspended when they refused to remove the armbands. *Id.* The Supreme Court held that the schools' actions violated the students' First Amendment rights because school authorities had no reason to anticipate a "substantial disruption of or material interference with school activities," and no disruptions on the school premises had, in fact, occurred. *Id.* at 514, 89 S.Ct. at 740.

Since *Tinker*, broader rationales have emerged for disciplining and limiting student speech in public schools. In *Fraser*, the Supreme Court upheld a high school's suspension of a student who spoke at a school assembly using "elaborate, graphic, and explicit sexual metaphor." 478 U.S. at 678, 106 S.Ct. at 3161. The Court emphasized that schools have the authority to determine what "manner of speech in the classroom or in school assembly is inappropriate" and that permitting the inappropriate speech would "undermine the school's basic educational mission." *Id.* at 683, 685, 106 S.Ct. at 3164, 3165. In *Morse*, the Supreme Court upheld the suspension of a high-school student for displaying a banner containing a slogan that promoted illegal drug use during an off-campus, school-supervised event. 551 U.S. at 396, 127 S.Ct. at 2622. Noting the "governmental interest in stopping student drug abuse," the Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Id.* at 397, 408, 127 S.Ct. at 2622, 2629; *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988) (holding that schools may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns").

■ Tatro argues that a university may only limit or discipline student speech that constitutes a "true threat" and that her Facebook posts cannot reasonably be construed as true threats. Under the true-threat standard, "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual

or group of individuals" are not protected by the First Amendment. *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 1548, 155 L.Ed.2d 535 (2003) (analyzing whether cross burning may be prima facie evidence of intent to intimidate and per se proscribed as a true threat); *Watts v. United States*, 394 U.S. 705, 707–08, 89 S.Ct. 1399, 1401–02, 22 L.Ed.2d 664 (1969) (applying true-threat analysis in the context of the criminal law).

In arguing that the true-threat analysis applies in the context of student speech, Tatro relies, in part, on the Eighth Circuit's analysis in *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 621–27 (8th Cir.2002). In that case, a junior high-school student wrote, from his home, a threatening and vulgar letter about an ex-girlfriend. *Doe*, 306 F.3d at 619. When the ex-girlfriend later received the letter at school, the principal was notified, and the school expelled the student. *Id.* at 619–20. The Eighth Circuit held that the school did not violate the student's First Amendment rights by expelling him for the threatening letter, discussing and applying only the true-threat analysis. *Id.* at 621–27. *See also Riehm v. Engelking*, 538 F.3d 952, 958, 963–64 (8th Cir.2008) (applying *Doe* and true-threat analysis in holding that decision to place a high-school student in protective custody did not violate First Amendment rights when an essay written by the student detailed a "fantasy murder-suicide"). Tatro argues that, as in *Doe*, we should apply the true-threat standard, contending that this analysis would be especially appropriate in the university setting. We are not persuaded.

We decline to depart from the standard set forth in *Tinker* and its progeny. As the university observes, this is not a criminal case. *Cf. Watts*, 394 U.S. at 707–08, 89 S.Ct. at 1401–02. Apart from *Doe*, Tatro cites no authority for applying the true-

threat analysis to discipline of student speech by a public university. And most courts hold that student expression need not reach the true-threat threshold before a public school may take appropriate disciplinary action in the interest of protecting the work and safety of its community. *See, e.g., Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 38–39 (2d Cir.2007) (applying *Tinker* substantial-disruption standard to analyze school discipline of a student's expression reasonably understood as urging violent conduct, and rejecting *Doe*, stating that "school officials have significantly broader authority to sanction student speech" than the true-threat standard allows).

We also reject Tatro's contention that the *Tinker* substantial-disruption analysis does not apply in a university setting. We discern no practical reasons for such a distinction and note that other courts have acknowledged *Tinker*'s broad applicability to public-education institutions. *See, e.g., DeJohn v. Temple Univ.*, 537 F.3d 301, 315–20 (3d Cir.2008) (analyzing a university's policy against harassment using the *Tinker* framework while acknowledging the differences between primary schools and universities). We observe, as the Third Circuit did in *DeJohn*, that what constitutes a substantial disruption in a primary school may look very different in a university. *See id.* at 318 (recognizing the need for "caution" in applying *Tinker* to student speech on college campuses). But these differences do not per se remove the *Tinker* line of cases from the analysis. Accordingly, we apply the *Tinker* substantial-disruption standard to determine whether the university acted within the boundaries of its authority to discipline student expression.

■ Our analysis turns on whether the record demonstrates that Tatro's posts "materially and substantially disrupt[ed]" the work and discipline of the university.

*See Tinker,* 393 U.S. at 513, 89 S.Ct. at 740. Both faculty members and students expressed concern that Tatro's post discussing a "Death List" and wanting to "stab" someone constituted real threats of physical violence, prompting a police investigation. The fact that the university's concerns were later assuaged does not diminish the substantial nature of the disruption that Tatro's conduct caused or the university's need to respond to the disruptive expression. A school need not wait for actual violence to occur before taking appropriate steps to ensure the safety of its community.

Beyond the university's concern for the safety of its students and faculty, Tatro's posts presented substantial concerns about the integrity of the anatomy-bequest program. Tatro's posts eventually reached families of anatomy-bequest-program donors and funeral directors, causing them to contact the university, expressing dismay and concern about Tatro's conduct and to question the professionalism of the program in general—a program that relies heavily on the faith and confidence of donors and their families to provide necessary laboratory experiences for medical and mortuary-science students. Indeed, the rules requiring respect and professionalism in the sensitive area of mortuary science appear designed to ensure ongoing trust in this relationship, and Tatro agreed to be bound by these rules as a condition of her access to a human donor. Because Tatro's Facebook posts materially and substantially disrupted the work and discipline of the university, we conclude that the university did not violate Tatro's First Amendment rights by responding with appropriate disciplinary sanctions.

**IV. The university was authorized to change one of Tatro's course grades as a disciplinary sanction.**

The university changed Tatro's grade in her anatomy-laboratory course, MORT 3171, from a "C+" to an "F," concluding that the failing grade is "consistent with the course syllabus, which explicitly states: 'Failure to adhere to these rules may result in your eviction from the cadaver lab and the course.'" Tatro argues that the university lacked the authority to change her grade because this is not listed as a permissible sanction within the conduct code or the policies of the mortuary-science program. Tatro also argues that the course syllabus only permits the university to "evict" a student for violating course rules and that it may not "fail" a student where she has "completed all of the requirements" and already earned a passing grade.

■ We disagree. As we have already discussed, the university may properly consider and enforce course-specific rules. The disciplinary complaint was filed against Tatro near the end of the semester. Despite the pending disciplinary hearing, Tatro's instructor allowed her to take the final exam for MORT 3171, but advised her that a failing grade would be recommended as a sanction should she be found responsible for rule violations. We discern no meaningful distinction between eviction from a course and receiving a failing grade in this case. A student evicted from a class near the end of a term does not receive a passing grade. Tatro acknowledged this potential consequence when she signed the mortuary-science program forms at the beginning of the semester. Accordingly, we conclude that the university acted within its authority in awarding a failing grade for the course, and on this record, this sanction is not arbitrary, oppressive, or unreasonable. *See Chronopoulos,* 520 N.W.2d at 441.

## DECISION

The university acted within its authority in addressing Tatro's Facebook posts and

did not violate Tatro's right to free speech. Because the evidence supports the university's determinations that Tatro violated university rules and the sanctions imposed were not arbitrary, oppressive, or unreasonable, we affirm.

**Affirmed.**