*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0133**

State of Minnesota,
Appellant,

vs.

Harrison William Rund,
Respondent.

**Filed August 8, 2016
Affirmed as modified
Stauber, Judge
Dissenting, Ross, Judge**

Dakota County District Court
File No. 19HACR14478

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Jennifer S. Bovitz, Assistant County Attorney, Hastings, Minnesota (for appellant)

Steven T. Grimshaw, Minneapolis, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Stauber, Judge; and John Smith, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**STAUBER**, Judge

In this sentencing appeal, the state challenges the district court's imposition of a 365-day stayed sentence for respondent's terroristic-threats conviction. The record supports the district court's determination that the offense was a result of youthful indiscretion and thus less serious than the typical offense, justifying the one-day downward durational departure from the presumptive sentence. We affirm the duration of the sentence imposed by the district court but reduce the probationary term to two years because the three-year probationary term imposed by the district court is unauthorized by law.

## FACTS

At approximately 1:30 a.m. on February 4, 2015, respondent Harrison William Rund, then 19 years old, was pulled over by a state-patrol officer and ticketed for driving 68 miles per hour in a posted 60-mile-per-hour zone. Rund later admitted to having a history of problems with the state-patrol officer who gave him the ticket, but at the time of the offense Rund had no previous criminal offenses. Rund went home, "had a little bit to drink," and started talking to a friend on Twitter. During the Twitter discussion, Rund got "a little more heated" and "started saying things that I shouldn't have said." In a single tweeting incident, Rund posted the following threatening statements to his friend

that hashtagged[1] the St. Paul Police and the St. Paul Police Federation:

> dude its f*d up im getting so pissed out here literally thinkin about just startin to hunt and kill cops.
>
> f*k you st paul police im gonna kill 5 police officers today.
>
> im lookin for Zelda boi and whichever trooper pulled me over lastnight gave me a ticket for goin 68 in a 60.
>
> f*k the @St.PaulPoliceFdn they don't call me the cop killer for no reason.
>
> Throw a grenade in the room, watch all the coppers ka-boom.

The last tweet references a song lyric and includes a photo of St. Paul police officers.

The next day, police apprehended Rund as he arrived home after school and work, and he was charged with making terroristic threats, a felony. Against the advice of counsel, Rund gave a complete confession to police, waived all trial rights, and entered a straight guilty plea to the charge. At his plea hearing, Rund admitted that what he did was wrong, and that he abhorred his conduct. He said, "I don't think people should be able to say these things, and that's why, one of the reasons I am here and not taking it to trial and stuff, because I think it was wrong, and people shouldn't be let off if they say things like that." He also expressed remorse about frightening any police officers, saying:

> [I]t wasn't my intent, you know. I think if you scroll through my old Twitter, I think just about everything on there was not serious, you know. Whether I was talking crap to Jose

---

[1] In social media, a hashtag is a word or phrase preceded by a hash or pound sign and used to identify messages on a specific topic. In this instance, by hashtagging two police entities, Rund likely believed that the entities would receive notice of his threatening messages, much like a "cc" can be used in an e-mail.

Canseco, you know, I mean, everything on there I kind of looked at it as kind of a joke, and I just took it way too far.

Rund worked with a psychologist for about a year and a half after he committed the offense, and at sentencing the district court judge referenced a letter he had received from the psychologist stating that Rund had made significant progress in the management of his mood and no longer needed any treatment. Rund also sent a letter of apology to the law-enforcement officers and a letter of remorse to the district court. Rund testified at sentencing that he no longer uses alcohol. Rund called his offense "really stupid," and said he was "really sorry," "kn[e]w what [he] did wasn't right," and "kn[e]w that it's a big deal and shouldn't be taken lightly," but he also said that the offense did not "reflect[] who I am." At the time of sentencing, Rund was going to school full time and working 15-20 hours per week.

Defense counsel moved for a downward durational departure for three identified offense-related reasons: Rund's remorse, Rund's intoxication, and the use of social media to commit the crime, the last of which defense counsel argued made the offense not a "standard terroristic threats case." Consistent with the sentencing guidelines, the state sought a stayed felony sentence of a year and a day, with Rund to serve 60 days in jail as a condition of probation.

The district court considered offender- and offense-based arguments at sentencing. The district court judge referred to Rund as a "young person who is going through a very tough time," but said that the offense had "sparked you to take a good, hard look at not only your drinking but your psychological issues, and you have addressed those." The

4

judge referred to the offense as "less onerous" because of Rund's age and mental state, and his lack of intent to "make a planned attack," and said that imposition of a felony sentence would not be "in the best interests of society." Over the state's objection, the district court imposed a stayed 365-day sentence and placed Rund on probation for three years, one year longer than the probationary term provided for by law. The district court also required Rund to serve a 120-day jail sentence, twice the duration sought by the state. Minn. Stat. § 609.135, subd. 2(c) (2014) (stating that a probationary term for a gross misdemeanor offense "shall be for not more than two years").[2] The state appealed.

### DECISION

Historically, it is the state's function to investigate and determine charges for criminal conduct, and it is the district court's function to exercise discretion in imposing a sentence. "At one end of t[he] spectrum, bringing charges and plea bargaining, the discretion rests almost entirely with the prosecutor. At the other end of the spectrum, [in] the imposition of the sentence . . ., the discretion rests almost entirely with the court." *State v. Streiff*, 673 N.W.2d 831, 836 (Minn. 2004).

The state challenges the district court's decision to impose a sentence that constitutes a one-day downward durational departure from the presumptive sentence. "The district court must order the presumptive sentence provided in the sentencing

---

[2] The district court judge noted at both the plea and sentencing hearings that the judge's brother is a career St. Paul police officer. Before imposing sentence, the district court gave Rund a tongue-lashing for committing this crime when those in the law enforcement community are facing ever-increasing work dangers, including being subject to personal attack.

5

guidelines unless substantial and compelling circumstances warrant a departure." *State v. Pegel*, 795 N.W.2d 251, 253 (Minn. App. 2011) (quotation omitted). Substantial and compelling circumstances are those that make the case atypical. *Taylor v. State*, 670 N.W.2d 584, 587 (Minn. 2003). The district court has discretion to decide whether to depart at sentencing, and this court will reverse only if the district court abused its discretion. *Pegel*, 795 N.W.2d at 253.

The presumptive punishment for Rund's conviction of terroristic threats is a felony sentence. Minn. Stat. § 609.713, subd. 1 (2014) (permitting sentence of "not more than five years"). A "felony" is defined as "a crime for which a sentence of imprisonment for more than one year may be imposed." Minn. Stat. § 609.02, subd. 2 (2014). A "gross misdemeanor" is defined as "any crime which is not a felony or misdemeanor." Minn. Stat. § 609.02, subd. 4 (2014). But when the district court imposes a gross-misdemeanor sentence on a felony offense, the law deems the conviction a gross misdemeanor. Minn. Stat. § 609.13, subd. 1(1) (2014). The imposition of a gross-misdemeanor sentence for a felony conviction with a presumptively stayed sentence is a downward durational departure. *State v. Bauerly*, 520 N.W.2d 760, 762 (Minn. App. 1994) (ruling that imposition of a 365-day gross-misdemeanor sentence on a felony theft conviction with a presumptive guidelines sentence of 366 days constituted a downward durational departure), *review denied* (Minn. Oct. 27, 1994).

Sentencing factors specific to the offender can support a dispositional departure, but they cannot be used to support a durational departure. *State v. Peter*, 825 N.W.2d 126, 130 (Minn. App. 2012) (enumerating offender-related factors such as remorse, clean

6

record, offender's youth, family support, and offender's ability to obtain education and employment), *review denied* (Minn. Feb. 27, 2013). Offense-related factors, however, can support a durational departure. *Id.* On a motion for a durational departure, the district court must examine "whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Cox*, 343 N.W.2d 641, 643 (Minn. 1984).

The record demonstrates that the district court relied on both offender- and offense-related factors in imposing the durational departure. To the extent that the district court weighed Rund's remorse in departing, it was improper to do so under the facts presented. Lack of remorse may be used to justify a durational departure, but only if the "remorse is directly related to the criminal conduct at issue and made that conduct significantly less serious than the typical conduct underlying the offense of conviction." *State v. Solberg*, ___ N.W.2d ___, ___ 2016 WL 4051620, at *6 (Minn. July 27, 2016). Rund's remorse for his crime occurred after its commission and did not alter the seriousness of the crime itself. Further, the second ground argued by defense counsel for departure, Rund's voluntary intoxication, does not make him less culpable. *See* Minn. Sent. Guidelines 2.D.3.a.(3) (2014) (specifically excluding "[t]he voluntary use of intoxicants" as a factor to be considered at sentencing); *State v. Cizl*, 304 N.W.2d 632, 634 (Minn. 1981) (stating that a defendant's voluntary intoxication at the time of the offense may not be used to justify a downward departure).

But "a single mitigating factor may provide a substantial and compelling reason to impose a downward durational sentencing departure if it shows that the defendant's

7

conduct in committing the offense of conviction was significantly less serious than that typically involved in the commission of the offense in question." *Solberg*, 2016 WL 4051620, at *7. The district court concluded that the offense was committed in a less serious manner than the typical terroristic-threats offense. This is an offense-related factor that was permissible for a durational departure. On the seriousness of the offense, the sentencing judge said,

> I don't think you had the intent to do it. You didn't have a gun. You weren't going out to try to search where they live. You weren't going to make a planned attack. You just wanted to send a tweet out to affect as many people as you can, and that worked. As far as taking steps to follow up, you had no intention.

The sentiment expressed by the district court is supported by the fact that some of Rund's tweets were quotes of inflammatory song lyrics or were references frequently used in gangster rap. The use of language that expresses approval of violence against police, while disturbing in this case, may not indicate actual intent to "kill a cop" and may merely constitute a protest against police conduct. *See, e.g.,* Rob Hustle ft. Bump, *Call the Cops* (Youtube 2014); N.W.A., *F[--]k tha Police, on* Straight Outta Compton (Andre Young, Antoine Carraby 1988). Defense counsel also argued that terroristic-threats crimes typically involve either making threats face-to-face or sending them in the mail, both of which demonstrate greater intent and more serious conduct than was shown by Rund. Rund's conduct, made with use of a hashtag on social media, was more like a taunt than a threat. *See, e.g., Elonis v. United States,* 135 S. Ct. 2001, 2012 (2015) (reversing federal conviction for making threatening communications based on offender's

8

statements posted on the Facebook social media website, when the evidence was insufficient to prove that the offender intended to issue a threat or knew that the communication would be viewed as a threat); Elise Moreau, *10 Types of Internet Trolls You'll Meet Online* http://webtrends.about.com/od/Internet-Culture/tp/10-Types-of-Internet-Trolls-Youll-Meet-Online.htm (noting the phenomenon of internet "trolling" in which individuals "deliberately tr[y] to disrupt, attack, offend or generally cause trouble within the [internet] community by posting certain comments, photos, videos, GIFs or some other form of online content").

The terroristic threats statute under which Rund was convicted includes a broad range of conduct and a broad range of intent. The crime is defined as "threaten[ing], directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1. The intent element of the offense includes either intent to do the act or reckless conduct that results in the act. *Id*. The prohibited conduct thus includes direct threats made with the purpose to terrorize as well as indirect threats made recklessly that result in causing terror. *Id*.

Given the broad spectrum of prohibited conduct and broad range of intent included in the definition of the offense, we cannot conclude that the district court abused its discretion by weighing this case against others of its kind and concluding that Rund's offense was less serious than the typical offense. The district court's determination of Rund's lack of intent is clearly supported by the record, including Rund's testimony that

9

he used Twitter jokingly but that his conduct got out of hand in this instance.[3] The

district court's statement that Rund "did not intend to do it" is supportive of its

conclusion that Rund's conduct demonstrated only recklessness and not specific intent to

terrorize. Such conduct meets the definition of the crime but is also reflective of an

"internet sensibility" of social-media users who rely on alter-egos to express hostile

thoughts and invective that are not intended to leave the social-media arena. While this

conduct might be actionable under the law, it is not as serious as other terroristic-threats

offenses.

This court has affirmed a district court's exercise of discretion to impose a

downward durational departure when the conduct of the offender did not involve the

typical crime for which the offender was sentenced. *State v. Bendzula*, 675 N.W.2d 920,

924 (Minn. App. 2004). In *Bendzula*, this court affirmed the district court's downward

durational departure in sentencing on a controlled-substance crime where the offender

was less culpable than the typical offender. *Id.* There, this court stated, "Because the

[district] court in this case dealt with the departure issue both deliberatively and

thoroughly, and because the court adequately identified considerations favoring its

downward departure that were both atypical and substantial, we must defer to its

judgment." *Id.* at 923. Similarly here, we uphold the district court's exercise of its

---

[3] We note that a comment to the Model Penal Code, upon which the crime of terroristic
threats is based, states that the purpose of the code is not "to authorize grave sanctions
against the kind of verbal threat which expresses transitory anger." 10 U.L.A. Model
Penal Code § 211.3 Comments (Tent. Draft 1960). Rund's conduct shows sufficient
intent to establish that he was not merely joking or being flippant.

sentencing discretion where the offense is less onerous than the typical offense; our ruling is consistent with the equitable goal of the sentencing guidelines to punish offenders who have committed similar conduct by imposing similar sanctions on them. *Id.* at 924 (noting that the sentencing "guidelines expressly enlarge the [district] court's discretion when assessing reduced culpability and determining a downward departure").[4]

We affirm the district court's imposition of a one-day downward durational departure from the presumptive sentence but modify Rund's sentence to reduce the three-year probationary term to two years, the limit provided for by law. *See* Minn. Stat. § 609.135, subd. 2(c).

**Affirmed as modified.**

---

[4] The dissent singles out certain facts from the record and focuses on those facts to support its view that we should reverse Rund's sentence. Again, it is the district court's function to exercise discretion at sentencing, and it is our function as an appellate court to affirm a sentence that is a proper exercise of that discretion. *See State v. Patterson*, 796 N.W.2d 516, 533 (Minn. App. 2011) (stating that court of appeals is an "error correcting court"), *aff'd* 812 N.W.2d 106 (Minn. 2012). Because we conclude that there was a proper basis for a sentencing departure under the facts as found by the district court, we decline to re-cast those facts. The dissent also chastises us for failing to discuss the "'typical' terroristic threat" case. But the district court differentiated this case, in which it found very little evidence of intent and only an indirect threat, from other types of terroristic threats cases, and concluded that the facts of this case made it atypical. We cannot disagree with the method or logic of the district court's analysis. We also note that there is a dearth of terroristic-threats cases involving the use of social media, but we are satisfied that the facts of this case are very different from terroristic-threats cases that involve more intentional conduct or direct threats, such as the cases relied on by the dissent.

11

**ROSS**, Judge (dissenting)

The district court lacks absolute sentencing discretion. And here it certainly had no evidence of any "substantial and compelling" offense-related mitigating factor when it chose to shorten Harrison Rund's sentence, effectively diluting from a felony to a gross misdemeanor the seriousness of his conviction for threatening to massacre police officers. This is not a close case. I respectfully dissent.

Rund used a mechanism of a social-media program to ensure that the targets of his threats—police officers and a trooper he had just encountered in person—would see them. In five progressively more inflammatory pronouncements, Rund first threatened that he was just considering "startin[g] to hunt and kill cops." He next punctuated his anger with an expletive and identified the target police agency and declared without qualification, "[I'm] gonna kill 5 police officers today." Next he specified that he was "lookin for" a particular officer along with "whichever trooper pulled [him] over last night [and] gave [him] a ticket for goin 68 in a 60." Then he again identified the police agency and boasted, "[T]hey don't call me the cop killer for no reason." And finally he described, "Throw a grenade in the room, watch all you coppers kaboom," this time including a photograph of officers whom he implied he soon would kill. On a different social-media website, Rund posted an image of himself brandishing what appeared to be a revolver.

Police, unsurprisingly, mounted an immediate investigation to identify and locate the self-professed cop killer. They learned the next day that the postings originated from Rund's South St. Paul home, and they identified Rund as the culprit. Multiple officers converged on the home. They confronted and arrested Rund.

At the moment of his arrest—and, as far as the record reveals, for the first time—Rund began saying that he should not have made his violent threats.

The majority says that "[t]he state challenges the district court's decision to impose a sentence that constitutes a one-day downward durational departure from the presumptive sentence." That's a bit soft. The state's actual position on appeal is this: the state challenges the district court's decision to shorten the statutorily presumed prison sentence so as to convert Rund's felony death-threat conviction into a mere gross misdemeanor.

The supreme court has established the "general rule" that offender-related factors "may be used to justify a dispositional departure," but only offense-related factors can support a durational departure. *State v. Chaklos*, 528 N.W.2d 225, 228 (Minn. 1995). The majority therefore rightly rejects most of the district court's stated bases for the departure. But I dissent from the majority's affirming the district court's holding that Rund committed his offense in a less serious manner than the typical-terroristic threats offense. The majority cites no cases discussing the "typical" terroristic threat. Nor does it look comparatively to the statute. Looking at the statute and then at caselaw, I am sure that Rund's conduct was more serious, not less serious, than the typical case. It justifies no downward departure.

The crime of terroristic threats occurs when one "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1 (2014). Rund did not make a mere indirect threat, which might, depending on the circumstances, arguably make this case less serious. He opted for multiple blunt, direct threats, identifying with particularity and passion that he was "gonna kill 5 police officers today." And of the

various "crime[s] of violence" that a terrorist might threaten to commit, like, for example, an assaultive strike in the face, Rund chose the extreme. His threat instilled in his identified and photographically depicted targets concern about their especially violent impending mass murder, being blown apart with an explosive device. How is this committing the crime of terroristic threats in a *less* serious manner? Isn't it instead obviously the *most* serious manner? And Rund was guilty of the crime even after his first or second communication, but, not opting for a minimal approach, Rund continued with three more threats, each increasing in intensity and clarity. He also would have been guilty of threatening a single police officer, but he threatened an entire, specific group of them. It is clear to me that the manner of Rund's offense is far, far more serious than the terroristic-threat offense defined by the statute.

The caselaw corroborates that Rund's offense was plainly *more* serious than the typical case. There can be no question about this. A sampling of terroristic-threats cases involving little or no actual physical violence confirms my impression that the manner of Rund's multiple-victim, grenade-referenced death threat was certainly not *less* serious than the manner of the usual case. *See, e.g.*, *State v. Stephenson*, 361 N.W.2d 844, 845 (Minn. 1985) (affirming conviction when "defendant, angry over being dismissed from a training program at an area vocational-technical school, expressly threatened to kill an assistant director . . . and implicitly threatened to kidnap or cause other harm to the program chairperson"); *State v. Smith*, 825 N.W.2d 131, 136 (Minn. App. 2012) (affirming conviction when defendant's "conduct constituted a threat to assault [one person] with [a] knife"), *review denied* (Minn. Mar. 19, 2013); *State v. Knaeble*, 652 N.W.2d 551, 557

(Minn. App. 2002) (affirming terroristic-threat conviction after "[t]he state presented the testimony of two officers that [a man] told them that [his brother] had threatened to 'chop his head off'" during an argument), *review denied* (Minn. Jan. 21, 2003); *State v. Marchand*, 410 N.W.2d 912, 914 (Minn. App. 1987) (affirming conviction of angry owner of towed car who yelled at the complainant and a companion, "I know where you live and I know what kind of vehicles you have, and if I ever see you . . . I'll run your asses right off the road"), *review denied* (Minn. Oct. 21, 1987); *and cf. State v. Morris*, 609 N.W.2d 242, 246 (Minn. App. 2000) (affirming an *upward* departure on various aggravating factors including multiple victims), *review denied* (Minn. May 23, 2000). Innumerable unpublished appellate cases also involving less serious threats than Rund's teach that these published examples are typical. Except for terroristic threats that also involve serious assaultive behavior or other physical confrontations, I have found no case like this one, where the defendant engaged in repeated threats of a mass killing using specific and extreme means.

The majority does not compare Rund's conduct to the conduct defined in the statute. Nor does it comparatively review our appellate terroristic-threats cases to see if this one fits the typical-facts mosaic. It just relies on this district court comment about Rund's "intent":

> I don't think you had the intent to do it. You didn't have a gun. You weren't going out to try to search where they live. You weren't going to make a planned attack. You just wanted to send a tweet out to affect as many people as you can, and that worked. As far as taking steps to follow up, you had no intention.

Based on this finding alone, the majority deems it okay to reduce Rund's presumptive felony sentence. It reasons that, because of the "broad range of intent included in the [statutory] definition of the offense," the district court can depart downward.

But the majority's flaw is evident: the crime of terroristic threats always includes the terrorist's intent to threaten but rarely the intent to actually commit the threatened act. Like Rund's crime, it involves only his "purpose to terrorize another" or his "reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1. When the district court told Rund, "You just wanted to send a tweet out *to affect* as many people as you can, and that worked," what it meant in context is that Rund wanted to send a tweet out *to terrorize* as many people as he could, and *that* worked. (Emphasis added.) That no evidence exists to show additionally that Rund planned to assassinate the officers is, thankfully, similar to the typical threats cases we see. Rund's intentionally terrorizing "as many people as [he could]" by informing them he was going to slaughter them does not make this "less serious" than the typical threats case; it makes it much *more* serious.

The majority most surprisingly opines in conclusion that internet threats on social media "are not intended to leave the social-media arena" and are therefore "not as serious as other terroristic-threats offenses." Even the district court did not see it that way. It told Rund, "[P]eople think they can throw out threats . . . and they will never be identified, threatening the police during a terrible time that's going on with law enforcement." It expressly observed that when police face threats on social media, "[T]hey take each [threat] seriously," and, "They don't know who they are dealing with, and *it does make it worse*." (Emphasis added.)

Even without the district court's observations, we know that social media is of course a forum to terrorize. Bullies use social media to terrorize. *See, e.g., Tatro v. Univ. of Minn.*, 800 N.W.2d 811, 817 (Minn. App. 2011) (evaluating student's Facebook threat "to stab a certain someone in the throat with a trocar"), *aff'd on other grounds*, 816 N.W.2d 509 (Minn. 2012). Domestic abusers use social media to terrorize. *See, e.g., State v. Gordon*, No. A14-1036, 2015 WL 3822757, at *1 (Minn. App. June 22, 2015) ("But P.G. remained fearful of Gordon, who regularly drove by her home and called her and sent her hostile and threatening text and Facebook messages."), *review denied* (Minn. Sept. 15, 2015). Even ISIS uses social media to terrorize! *See* Matt Payton, *Danish Man Faces Terror Charges After Posting ISIS Videos on Facebook*, The Independent (May 12, 2016), http://www.independent.co.uk/news/world/europe/isis-video-facebook-post-danish-man-charged-for-threatening-terror-attacks-a7025471.html. The majority's peculiar impression that violent threats are somehow less serious when they come by social media is simply not supported by any finding, by the evidence, or by common knowledge and experience.

I would reverse. The district court abused its discretion, and this court errs by holding that, so long as one isn't really "going to make a planned attack" to carry out his apparently credible threat to blow up five specific police officers in a specific agency on a specific day, he has a "substantial and compelling" reason to receive a substantially lower sentence because he has established that his is a less-than-typical threats case. If this multiple-specific-cop-killing threats case really is so exceptionally *less* serious than the "typical" threats case, what must *that* case look like?