Amanda TATRO, Appellant,

v.

UNIVERSITY OF MINNESOTA, Respondent.

No. A10–1440.

Supreme Court of Minnesota.

June 20, 2012.

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, MN, for appellant.

Mark B. Rotenberg, General Counsel, Tracy M. Smith, Associate General Counsel, Minneapolis, MN, for respondent.

Raleigh H. Levine, William Mitchell College of Law, Teresa Nelson, St. Paul, MN, for amicus curiae American Civil Liberties Union.

Abigail S. Crouse, Carl Crosby Lehmann, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for amici curiae American Council on Education, the Association of American Medical Colleges, the Association of American Universities, the Association of Public and Land-grant Universities, and the American Association of State Colleges and Universities.

Ada Meloy, Washington, DC, for amicus curiae American Council on Education.

Frank Trinity, Heather Johnson–Alarcon, Washington, DC, for amicus curiae Association of American Medical Colleges.

Dawn C. Van Tassel, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, and Frank D. LoMonte, Student Press Law Center, Arlington, VA, for amicus curiae Student Press Law Center.

Thomas C. Gallagher, Minneapolis, MN, and William Creeley, Philadelphia, PA, for amicus curiae Foundation for Individual Rights in Education.

Kevin Finnerty, Assistant Attorney General, St. Paul, MN, for amicus curiae Minnesota State Colleges and Universities by and through its Chancellor, Steven J. Rosenstone.

Jonathan P. Schmidt, Leah Ceee O. Boomsma, Briggs and Morgan, P.A., Minneapolis, MN, for amicus curiae American Board of Funeral Service Education.

TOMLJANOVICH, ESTHER and SCHURRER, GARY, Acting Justices.[1]

## OPINION

MEYER, Justice.

When appellant Amanda Tatro was a junior in the Mortuary Science Program at respondent University of Minnesota, she posted statements on Facebook, a social networking site, which she has described in court filings as "satirical commentary and violent fantasy about her school experience." After becoming aware of these posts, a faculty member referred the matter to the Office for Student Conduct and Academic Integrity. Following a hearing, the Campus Committee on Student Behavior (CCSB) found that Tatro had violated the Student Conduct Code and academic program rules governing the privilege of access to human cadavers. The CCSB imposed sanctions, which included a failing grade for an anatomy laboratory course. The University Provost affirmed the sanctions. On appeal, among other issues, Tatro argued that the University violated her constitutional rights to free speech by disciplining her for Facebook posts. The court of appeals upheld the disciplinary sanctions. We affirm the court of appeals' decision on the free speech issue, but use a different analysis. We hold that the University did not violate the free speech rights of Tatro by imposing sanctions for her Facebook posts that violated academic program rules where the academic program rules were narrowly tailored and directly related to established professional conduct standards.

The Mortuary Science Program is a Bachelor of Science program for upperclass undergraduate students. The Program Director testified that the primary purpose of the program—its "mission"—is

1. Appointed pursuant to Minn. Const. art. VI, § 2, and Minn.Stat. § 2.724, subd. 2 (2010).

to prepare students to be licensed funeral directors and morticians. The Mortuary Science Program requires students to pass science, business, psychology, and technical courses, as well as laboratory courses in anatomy, embalming, and restorative art. Students also must complete a clinical rotation at a funeral home.

The laboratory courses use human cadavers from the University's Anatomy Bequest Program. The Anatomy Bequest Program relies on individuals who volunteer to donate their bodies after death to the University. The Mortuary Science Program is one of several University departments, including medicine, dentistry, physical therapy, occupational therapy, and medical device engineering, which use human cadavers for teaching and research purposes.

In the fall of 2009, Tatro was enrolled in the three required laboratory courses. At the beginning of the semester, she received orientation and instruction in the policies of the Anatomy Bequest Program, and the rules governing the laboratory courses. Tatro then signed the Anatomy Bequest Program Human Anatomy Access Orientation Disclosure Form, acknowledging that she understood and agreed to comply with the program rules, as well as "additional laboratory policies" stated in the course syllabus. Without signing the form, Tatro would not have been allowed to participate in the laboratory courses.

The course syllabus for the anatomy lab included rules "set up to promote respect for the cadaver." The anatomy lab rules allowed "respectful and discreet" "[c]onversational language of cadaver dissection outside the laboratory," but prohibited "blogging" about the anatomy lab or cadaver dissection. The instructor for the anatomy lab course testified that "blogging" was intended to be a broad term and that she explained to the students during orientation that blogging included Facebook and Twitter. Students were advised that "[f]ailure to adhere to these rules may result" in the student's "eviction" from the anatomy lab and the course.

On December 11, 2009, Tatro's Facebook activity was brought to the attention of the Mortuary Science Program Director. The activity at issue was a series of writings on Tatro's Facebook page, commonly known as "posts" or "status updates." At the time of these posts, Tatro's Facebook privacy settings allowed her "friends" and "friends of friends" to see what she had posted. Tatro had "hundreds" of Facebook friends.

The University's discipline of Tatro has focused on the following four posts:

- **Amanda Beth Tatro** Gets to play, I mean dissect, Bernie today. Let's see if I can have a lab void of reprimanding and having my scalpel taken away. Perhaps if I just hide it in my sleeve ... [November 12, 2009]

- **Amanda Beth Tatro** Is looking forward to Monday's embalming therapy as well as a rumored opportunity to aspirate. Give me room, lots of aggression to be taken out with a trocar. [December 6, 2009]

- **Amanda Beth Tatro** Who knew embalming lab was so cathartic! I still want to stab a certain someone in the throat with a trocar though. Hmm ... perhaps I will spend the evening updating my "Death List # 5" and making friends with the crematory guy. I do know the code ... [December 7, 2009]

- **Amanda Beth Tatro** Realized with great sadness that my best friend, Bernie, will no longer be with me as of Friday next week. I wish to accompany him to the retort. Now where will I go or who will I hang with when I need to gather my sanity? Bye, bye

Bernie. Lock of hair in my pocket. [Undated.]

"Bernie" was the name that Tatro had given to the human cadaver on which she and her anatomy laboratory group members were training. Tatro testified that "Death List # 5" is a reference to one of her favorite movies, *Kill Bill,* and the phrase "Lock of hair in my pocket" is a reference to a song by the Black Crowes, one of her favorite bands.

On the morning of December 14, 2009, the Director of the Mortuary Science Program and other staff members met to discuss Tatro's Facebook posts. The Director testified that "[t]here was a lot of fear" surrounding Tatro's post about stabbing someone with a trocar[2] and hiding a scalpel in her sleeve. According to the Director, the staff members "were very much concerned for their safety," particularly given other well-known episodes of school violence outside of Minnesota. Based on these safety concerns, the Director called the University police. The Director and a University police officer met with Tatro at the University. The Director told Tatro to stay away from the Mortuary Science Department and staff members while the matter was being investigated. University police ultimately determined that no crime had been committed.

Tatro, believing that she had been suspended, attempted to bring attention to her punishment by reporting the incident to, and sharing her Facebook posts with, the news media. After Tatro appeared on local television stations, the Anatomy Bequest Program received letters and calls from donor families and the general public who expressed concerns about Tatro's lack of professionalism, poor judgment, and immaturity. Others questioned the University about the steps it would take to prevent

something like this from happening in the future.

On December 16, two days after the Mortuary Science staff meeting, the Director of the Office of Student Conduct and Academic Integrity (OSCAI) informed Tatro that she could return to school to complete her coursework and take her final examinations. The instructor of the anatomy lab course testified that if the timing of these events had been different—not on the eve of finals—she would not have allowed Tatro to come back to the lab or take the final examination and Tatro would not have passed the course. But the instructor consulted the OSCAI, which advised her to let Tatro take the final because "there's going to be some process here."

At the end of the term, the instructor entered Tatro's grade for the anatomy lab course—"MORT 3171"—as a "C +," but notified Tatro by e-mail that the instructor was submitting a formal complaint to the OSCAI. The instructor indicated that the Facebook posts violated the anatomy lab rules and the policies of the Anatomy Bequest Program. The instructor explained that the primary reason for the rules is that "people who have volunteered to graciously donate their bodies for the purposes of anatomy education do so with the intent to teach anatomy, not for the purposes of public display for amusement and fascination." The instructor recommended as a sanction for the violation of these rules "a grade of an F." On December 29, Tatro was informed that the OSCAI was investigating her for violations of the University's Student Conduct Code.

Tatro exercised her right to challenge the OSCAI complaint in a formal hearing before the CCSB. The Director of the

---

**2.** A trocar is a long hollow needle made of stainless steel that is typically inserted into the body during embalming to aspirate gas and fluids.

Mortuary Science Program, two instructors in the program, and the President of the Mortuary Science Student Association testified at the hearing about the program's emphasis on respect, dignity, and professionalism as a foundation for later working as a funeral director or mortician, as well as the need for respect for the donors to the Anatomy Bequest Program. The witnesses also testified about the general reaction to Tatro's Facebook posts, including the concern and fear that they and others at the University had expressed. The faculty members all believed that Tatro should be expelled from the Mortuary Science Program.

Tatro also testified at the CCSB hearing, explaining that she uses humor and jokes to release anxiety and to stave off depression due to her unique life circumstances. Tatro suffers from a debilitating central nervous system disease, and she has served as the primary caretaker for her mother, who suffers from the effects of a traumatic brain injury. Tatro intended her Facebook posts to be read only by friends and family who would understand her sarcasm, morbid sense of humor, and references to popular movies and songs. Tatro claimed not to understand that her Facebook posts fell within the scope of the blogging prohibition, but did acknowledge that she understood she was restricted from writing about the details of what she did in the lab and that restriction included Facebook.

Discussing the post about stabbing "a certain someone," Tatro explained that she was referring to an ex-boyfriend who lives in California and had broken up with her the night before she posted that Facebook entry. She knew that he would see the post and stated that she simply wanted him to know that she "was pissed." She also knew that "all the Mort Sci kids" would see the post, but she never intended to incite or induce fear in anyone. Tatro conceded, however, that she could understand how others might misunderstand her sense of humor, especially when taken out of context.

The CCSB found Tatro responsible for violating the Student Conduct Code provision prohibiting threatening conduct. According to the CCSB, Tatro's "postings and subsequent actions were threatening to the person in the posts, the department, and the students and faculty." The CCSB also found Tatro responsible for violating several University rules, which fall within the provision of the Student Conduct Code prohibiting "conduct that violates University, collegiate, or departmental regulations that have been posted or publicized, including provisions contained in University contracts with students." These rule violations included (1) Anatomy Laboratory Rule # 7, which provides in part that "[b]logging about the anatomy lab or the cadaver dissection is not allowable"; and (2) the rules listed on the Anatomy Bequest Program Human Anatomy Access Orientation Disclosure Form. The CCSB decision stated that Tatro's "actions were inappropriate for someone in this profession," indicating that "the reason that these rules are strict is to set standards for behavior from the beginning of the program that will carry into the profession." Therefore, to facilitate the "personal and professional development" of Tatro, the CCSB believed that "it would be helpful for [Tatro] to seek professional guidance." The CCSB imposed the following sanctions:

1. Changing Tatro's grade in MORT 3171 to an "F."

2. Completion of a "directed study course" in clinical ethics.

3. A letter to one of the faculty members in the Mortuary Science Program addressing the issue of respect within the program and the profession.

4. A psychiatric evaluation at the student health service clinic and completion of any recommendations made by their evaluation.

5. Placement on probation for the remainder of Tatro's undergraduate career.

Tatro appealed the CCSB's decision to the Provost's Appeal Committee (PAC), an advisory panel that makes a nonbinding recommendation to the Provost. After a hearing, the PAC recommended that the Provost uphold the CCSB's decision. Provost E. Thomas Sullivan issued a "final decision," which affirmed the findings of the CCSB and the sanctions imposed.

Tatro then appealed to the court of appeals by writ of certiorari, raising several challenges to the University's imposition of disciplinary sanctions. The court of appeals affirmed the sanctions, concluding that (1) the University had jurisdiction to conduct the disciplinary proceedings, (2) sufficient evidence supported the University's determination that Tatro had violated University rules, (3) the University had the authority to change one of Tatro's grades as a disciplinary sanction, and (4) the University did not violate Tatro's free speech rights. *Tatro v. Univ. of Minn.*, 800 N.W.2d 811, 817–23 (Minn.App.2011). We granted Tatro's request for further review of the free speech issue.

## I.

We first address the scope of the issues before us on review. In her petition for review, Tatro sought review of a single issue: "Whether a public university violates constitutional free speech rights by disciplining a student for Facebook posts that contain satirical commentary and violent fantasy about her school experience but do not identify or threaten anyone." Tatro did not raise any nonconstitutional issues, although the petition for review did assert that Tatro was "reserv[ing]" the

right "to challenge the applicability of the University's rules and its authority to impose discipline."

After we accepted review of Tatro's petition, Tatro filed her brief, which in addition to the free speech issue argued that the University lacked jurisdiction to conduct a disciplinary hearing, the University presented insufficient evidence to support the rule violations, and the University lacked authority to change a passing grade to a failing grade.

■ The Rules of Civil Appellate Procedure require a petitioning party to include a "statement of the legal issues sought to be reviewed" in the petition for review. Minn. R. Civ.App. P. 117, subd. 3(a). We have explained that this requirement facilitates "effective appellate review" of the petition for review, provides notice to the respondent of the issues on which review might be granted, and provides the court with notice of the scope of the review requested, thus providing the court with an opportunity, if review is granted, to limit the issues. *Hapka v. Paquin Farms*, 458 N.W.2d 683, 686 (Minn.1990). Although we have the discretion to consider additional issues, we generally will not address issues that were not specifically raised in the petition for review. *See In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn.2005); *Anderly v. City of Minneapolis*, 552 N.W.2d 236, 239–40 (Minn. 1996). In this case, we decline to review the nonconstitutional issues that Tatro did not specifically raise in the petition for review.

## II.

■ We next address Tatro's constitutional challenge to the sanctions imposed by the University. Tatro argues that the University violated her free speech rights under the United States and Minnesota Constitutions by disciplining her for satiri-

cal "literary expressions on her Facebook page." U.S. Const. amend. I; Minn. Const. art. I, § 3. Because the Minnesota constitutional right to free speech is coextensive with the First Amendment, we look primarily to federal law for guidance. *See State v. Wicklund,* 589 N.W.2d 793, 798–801 (Minn.1999) (declining to extend the free speech protections of the Minnesota Constitution "beyond those protections offered by the First Amendment").

■ We review constitutional free speech issues de novo. *Id.* at 797. In a recent school speech case, the United States Supreme Court explained that courts are "the final arbiter of the question whether a public university has exceeded constitutional constraints," and courts "owe no deference to universities" in considering that question. *Christian Legal Soc'y v. Martinez,* —— U.S. ——, 130 S.Ct. 2971, 2988, 177 L.Ed.2d 838 (2010). Nonetheless, "[c]ognizant that judges lack the on-the-ground expertise and experience of school administrators," the Court also held that school administrators' decisions related to the "pedagogical approaches" of a professional program— even outside the narrow confines of the classroom—"are due decent respect." *Id.* at 2988–89. In *Martinez,* which concerned the constitutionality of a law school policy that required officially recognized student groups to comply with the school's nondiscrimination policy, the Court stated that "determinations of what constitutes sound educational policy ... fall within the discretion of school administrators and educators." *Id.* at 2989 n. 16.

Before deciding whether the disciplinary sanctions violated Tatro's free speech rights, we must determine the applicable legal standards. The parties argue that different standards apply, depending upon whether we are considering the discipline for Tatro's violation of the academic pro-

gram rules, or the discipline for her violation of the "threatening conduct" rule.

## A. *Academic program rules.*

We first analyze the appropriate legal standard for Tatro's violation of the academic program rules. Tatro argues that the University violated her free speech rights by imposing discipline for her Facebook posts, which she claims were "outside her professional education activities." The University counters that it did not violate Tatro's free speech rights by enforcing reasonable academic program rules related to legitimate pedagogical objectives.

As a condition of access to human cadavers in her laboratory courses, Tatro was required to follow certain academic program rules, which included the Mortuary Science Student Code of Professional Conduct, the rules of the Anatomy Bequest Program, and the anatomy lab rules. By signing the Anatomy Bequest Program Human Anatomy Access Orientation Disclosure Form, Tatro acknowledged that "[t]he opportunity to review and dissect the human body is a privilege" that "carries with it an important responsibility" for treating the human cadaver "with utmost respect and dignity." In addition, Tatro agreed to follow specific anatomy lab rules, which provide that "[c]onversational language of cadaver dissection outside the laboratory should be respectful and discreet" and that "[b]logging about the anatomy lab or the cadaver dissection is not allowable." "The clear intent" of these rules, according to the Provost's decision, "is that all matters related to the lab, both in and outside the lab, must be taken seriously, done respectfully, and communicated about in a respectful and professional manner."

The University asserts that these academic program rules serve a dual purpose: to educate students concerning the profes-

sional and ethical responsibilities of the funeral service profession, and to maintain the viability of the Anatomy Bequest Program. In addition, amicus American Board of Funeral Service Education (ABFSE), the accrediting agency for funeral service education, represents that "the rules established and enforced by the University of Minnesota are of the type required by the ABFSE's accreditation standards."

The CCSB found that Tatro's Facebook posts violated academic program rules of the Mortuary Science Program.

- **Amanda Beth Tatro** Gets to play, I mean dissect, Bernie today. Let's see if I can have a lab void of reprimanding and having my scalpel taken away. Perhaps if I just hide it in my sleeve . . .

- **Amanda Beth Tatro** Is looking forward to Monday's embalming therapy as well as a rumored opportunity to aspirate. Give me room, lots of aggression to be taken out with a trocar.

- **Amanda Beth Tatro** Realized with great sadness that my best friend, Bernie, will no longer be with me as of Friday next week. I wish to accompany him to the retort. Now where will I go or who will I hang with when I need to gather my sanity? Bye, bye Bernie. Lock of hair in my pocket.

The Provost affirmed the findings of the CCSB, as well as the sanctions imposed, concluding that Tatro's Facebook posts were disrespectful and unprofessional. The court of appeals affirmed the Provost's decision, concluding that the evi-

dence supports the University's finding that Tatro violated academic program rules of the Mortuary Science Program, including "the overall policy requirement" that was explained during orientation "of treating donors with respect and dignity." *Tatro v. Univ. of Minn.*, 800 N.W.2d 811, 819 (Minn.App.2011).[3]

### 1. *Legal standards.*

The factual situation presented by this appeal has not been addressed in any published court decision—a university's imposition of disciplinary sanctions for a student's Facebook posts that violated academic program rules. Consequently, the constitutional standard that applies in this context is unsettled. The court of appeals relied on a line of cases beginning with *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), where the Supreme Court held that a school district may limit or discipline student expression if school officials reasonably conclude that the expression will "materially and substantially disrupt the work and discipline of the school." *See Tatro*, 800 N.W.2d at 820. Neither party asks us to apply this standard in the context of a university student's violation of academic program rules; the parties instead have advocated standards at different ends of the free speech spectrum.

Tatro's basic argument is that public university students are entitled to the same free speech rights as members of the general public with regard to Facebook posts. *See Healy v. James*, 408 U.S. 169,

---

**3.** The court of appeals did determine that certain of the University's findings of rule violations lacked evidentiary support. For example, the court concluded that the University's findings that Tatro violated an anatomy lab rule applicable to the physical handling of a cadaver and provisions of the Mortuary Science Student Conduct Code applicable in

the context of a funeral service or while transporting a decedent lacked evidentiary support. *Tatro*, 800 N.W.2d at 818–19. Nonetheless, the court of appeals concluded that the evidence supports the University's other determinations of rule violations and that "the sanctions imposed were not arbitrary, oppressive, or unreasonable." *Id.* at 823.

180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (stating that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'"). In contrast, the University argues that it may constitutionally enforce academic program rules that are "reasonably related to the legitimate pedagogical objective of training Mortuary Science students to enter the funeral director profession," even when those rules extend to off-campus conduct. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (stating that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns").

We conclude that neither of the standards proposed by the parties nor the standard applied by the court of appeals is appropriate in the context of a university student's Facebook posts when the university has imposed disciplinary sanctions for violations of academic program rules. First, we observe that the *Hazelwood* legitimate pedagogical concerns standard proposed by the University applies to "school-sponsored" speech and addresses the question "whether the First Amendment requires a school affirmatively to promote particular student speech." *Id.* at 270–71, 273, 108 S.Ct. 562. As the Supreme Court has explained, the legitimate pedagogical concerns standard applies to "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* at 271, 108 S.Ct. 562 (stating that "school-sponsored" speech comprises "expressive activities" that "may fairly be characterized as part of the school curriculum, whether or not

they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences").

In this case, because the public would not reasonably perceive Tatro's Facebook posts to bear the imprimatur of the University, the Facebook posts cannot be characterized as "school-sponsored speech." Applying the legitimate pedagogical concerns standard to a professional student's Facebook posts would give universities wide-ranging authority to constrain offensive or controversial Internet activity by requiring only that a school's actions be "reasonably related" to "legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 272–73, 108 S.Ct. 562. Further, the universe of "legitimate pedagogical concerns" has been broadly construed, at least in the high school setting, to cover values like "discipline, courtesy, and respect for authority." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.1989) (observing that "[t]he universe of legitimate pedagogical concerns is by no means confined to the academic"); *see also Brody v. Spang*, 957 F.2d 1108, 1122 (3d Cir.1992) (stating that avoidance of controversy is a valid pedagogical concern in a nonpublic school forum). Accordingly, we decline to extend the legitimate pedagogical concerns standard to a university's imposition of disciplinary sanctions for a student's Facebook posts.

Next, we recognize that courts often have applied the *Tinker* substantial disruption standard, as the court of appeals did here, to the regulation of student speech over the Internet. *See, e.g., J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F.Supp.2d 1094, 1107 (C.D.Cal.2010) (observing that "the majority of courts will apply *Tinker* where speech originating off campus is brought to school or to the

attention of school authorities"); *see also Morgan v. Swanson,* 659 F.3d 359, 384 (5th Cir.2011) (suggesting a dichotomy between "the private speech contemplated in *Tinker* [and] the school-sponsored speech discussed in *Hazelwood* "). For example, the Second Circuit has concluded that a high school student may be disciplined for "expressive conduct" in a publicly accessible blog posting "when this conduct 'would foreseeably create a risk of substantial disruption within the school environment,' at least when it was similarly foreseeable that the off-campus expression might also reach campus." *Doninger v. Niehoff,* 527 F.3d 41, 48 (2d Cir.2008) (quoting *Wisniewski v. Bd. of Educ.,* 494 F.3d 34, 40 (2d Cir.2007)). Similarly, the Pennsylvania Supreme Court concluded that a school could punish an eighth grade student for creating a threatening website directed at his algebra teacher where the website "created disorder and significantly and adversely impacted the delivery of instruction" at the school. *J.S. v. Bethlehem Area Sch. Dist.,* 569 Pa. 638, 807 A.2d 847, 869 (2002). In contrast, courts have refused to allow schools to regulate out-of-school speech where the speech did not or was not likely to cause a substantial disruption of school activities.[4]

Even though courts have applied *Tinker* to speech originating off campus that reaches the attention of school authorities, at least in the K–12 setting, we decline to apply the *Tinker* substantial disruption standard to Tatro's Facebook posts.[5] The *Tinker* substantial disruption standard

---

**4.** *See, e.g., J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 930–31 (3d Cir.2011) (concluding that a school district could not have reasonably forecast a substantial disruption after a student created on her home computer a MySpace profile that made fun of her middle school principal and took specific steps to make the profile private), *cert. denied,* —— U.S. ——, 132 S.Ct. 1097, 181 L.Ed.2d 978 (2012); *Layshock ex rel. Layshock v. Hermitage Sch. Dist.,* 650 F.3d 205, 217 (3d Cir.2011) (concluding that a high school could not punish a student merely because his creation of a "parody" MySpace profile of his principal outside of school reached inside the school), *cert. denied,* —— U.S. ——, 132 S.Ct. 1097, 181 L.Ed.2d 978 (2012).

**5.** We note that courts have struggled with the question of whether postings on social networking sites constitute on-campus or off-campus speech, given "the somewhat 'everywhere at once' nature of the internet." *Blue Mountain Sch. Dist.,* 650 F.3d at 940 (Smith, J., concurring). Although Tatro stresses that her Facebook posts were prepared off campus, our analysis does not make a distinction between on-campus and off-campus Facebook posts.

We also recognize that controversy exists over whether the free speech standards that developed in K–12 school cases apply in the university setting. *See generally* Kelly Sarabyn, *The Twenty–Sixth Amendment: Resolving the Federal Circuit Split over College Students' First Amendment Rights,* 14 Tex. J. C.L. & C.R. 27, 28–49 (2008). For example, the Third Circuit has indicated that "[p]ublic universities have significantly less leeway in regulating student speech than public elementary or high schools." *McCauley v. Univ. of V.I.,* 618 F.3d 232, 247 (3d Cir.2010) (citing "the differing pedagogical goals of each institution, the *in loco parentis* role of public elementary and high school administrators, the special needs of school discipline in public elementary and high schools, the maturity of the students, and, finally, the fact that many university students reside on campus and thus are subject to university rules at almost all times"). The Sixth Circuit, while acknowledging the differences between K–12 students and university students, has indicated that courts can account for different levels of maturity in the application of the standard. *Ward v. Polite,* 667 F.3d 727, 733–34 (6th Cir.2012). Further, the Ninth Circuit has pointed out that in the context of academic decisions, "arguably the need for academic discipline and editorial rigor increases as a student's learning progresses." *Brown v. Li,* 308 F.3d 939, 950, 951 (9th Cir.2002). Because we do not rely on any established free speech standards, we need not consider the issue here.

does not fit the purposes of the sanctions here. The driving force behind the University's discipline was not that Tatro's violation of academic program rules created a substantial disruption on campus or within the Mortuary Science Program, but that her Facebook posts violated established program rules that require respect, discretion, and confidentiality in connection with work on human cadavers.

Thus, we are left with the question of the appropriate legal standard to apply to the University's regulation of Tatro's Facebook posts. In deciding the constitutional rights of students, the Supreme Court has explained that the "mode of analysis set forth in *Tinker* is not absolute" and that courts must consider " 'the special characteristics of the school environment.' " *Morse v. Frederick*, 551 U.S. 393, 405, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (quoting *Tinker*, 393 U.S. at 506, 89 S.Ct. 733). For example, in *Morse*, the Court concluded that the governmental interest in stopping student drug abuse allowed a high school to restrict student expression reasonably regarded "as promoting illegal drug use." *Id.* at 408, 127 S.Ct. 2618 (concluding that high school officials did not violate the First Amendment by confiscating a pro-drug banner at a school-sanctioned, school-supervised event and suspending the student who had brought the banner to the event); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (holding that a high school "acted entirely within its permissible authority in imposing sanctions" in response to a student's "offensively lewd and indecent speech" at a school assembly, even without any showing of substantial disruption).

Consequently, we must consider the special characteristics of the academic environment of the Mortuary Science Program and its professional requirements when deciding the standard that applies.

The University and supporting amici curiae stress that the Mortuary Science Program is a professional program that trains students to be funeral directors and morticians. They contend that ethics are a fundamental part of the program and argue that the University is entitled to set and enforce reasonable course standards designed to teach professional norms. In support of the University's position, courts have concluded that in certain professional programs, valid curricular requirements can encompass compliance with professional and ethical obligations. *See, e.g., Ward v. Polite*, 667 F.3d 727, 732 (6th Cir.2012) (discussing a counseling program requirement of compliance with counseling code of ethics). For example, in a case involving a counseling student's noncompliance with an ethics code, the Eleventh Circuit concluded that when a state university conditions a student's participation in a counseling clinical practicum on compliance with a professional code of ethics, the student, "having voluntarily enrolled in the program, does not have a constitutional right to refuse to comply with those conditions." *Keeton v. Anderson–Wiley*, 664 F.3d 865, 878 (11th Cir.2011) (rejecting free speech and free exercise claims). On the other hand, a university cannot use a code of ethics "as a pretext" for punishing a student's protected speech. *Ward*, 667 F.3d at 735. In the *Ward* case, the Sixth Circuit concluded that a counseling student was entitled to a jury trial on her free speech and free exercise claims, stating that a reasonable jury could find that the university ejected the student from the counseling program "because of her faith-based speech," not because her conduct violated the code of ethics. *Id.* at 738.

Despite her starting point, which equates the free speech rights of university students with those of the general public, Tatro acknowledges that the University may constitutionally regulate "off-campus

conduct that violate[s] specific professional obligations." Specifically, Tatro understood that there were limitations on what she could post on Facebook about her work with human cadavers. As an extreme example, one of the instructors in the Mortuary Science Program testified at the CCSB hearing about an incident that occurred at a medical school in New York where a student posted a picture of a human cadaver on Facebook. According to the instructor, state health officials were considering sanctions against the medical school. Although Tatro does not dispute that the University could impose a narrow rule that would prohibit a mortuary science student from identifying a human donor on Facebook, she argues that the University cannot impose a broad rule that would prohibit mortuary science students from criticizing faculty members or posting offensive statements that are unrelated to the study of human cadavers.

 We acknowledge the concerns expressed by Tatro and supporting amici that adoption of a broad rule would allow a public university to regulate a student's personal expression at any time, at any place, for any claimed curriculum-based reason. Nonetheless, the parties agree that a university may regulate student speech on Facebook that violates established professional conduct standards. This is the legal standard we adopt here, with the qualification that any restrictions on a student's Facebook posts must be narrowly tailored and directly related to established professional conduct standards. Tying the legal rule to established professional conduct standards limits a university's restrictions on Facebook use to stu-

dents in professional programs and other disciplines where student conduct is governed by established professional conduct standards. And by requiring that the restrictions be narrowly tailored and directly related to established professional conduct standards, we limit the potential for a university to create overbroad restrictions that would impermissibly reach into a university student's personal life outside of and unrelated to the program. Accordingly, we hold that a university does not violate the free speech rights of a student enrolled in a professional program when the university imposes sanctions for Facebook posts that violate academic program rules that are narrowly tailored and directly related to established professional conduct standards.[6]

### 2. *Application of standards.*

We now examine whether the academic program rules of the Mortuary Science Program are narrowly tailored and directly related to established professional conduct standards. Tatro argues that the academic program rules, as applied to her, violate her free speech rights because the University is simply claiming that she violated "accepted *unwritten* social norms"— not any "specific standards or authorities governing professional behavior."

We first consider the scope of established professional conduct standards for the mortuary science profession. Tatro claims that the only established professional conduct standard potentially applicable to her Facebook posts pertains to the disclosure of "personally identifiable facts, data, or information about a decedent."

---

**6.** The court of appeals noted that Tatro "signed an agreement to follow the anatomy-laboratory, and the anatomy-bequest, program rules," which the court of appeals construed "as a contract" with the University. *Tatro,* 800 N.W.2d at 817. Our analysis of Tatro's free speech argument does not depend on Tatro's agreement to restrict her speech as a condition of participating in the laboratory courses. We concur with Tatro that a university cannot impose a course requirement that forces a student to agree to otherwise invalid restrictions on her free speech rights.

Minn.Stat. § 149A.70, subd. 7(5) (2010) (addressing professional conduct of mortuary science licensees and interns). Because her Facebook posts did not reveal any personally identifiable facts, data, or information about the human cadaver she was studying, Tatro contends that the University's "purported need to enforce professional standards is not applicable" and that the University violated her free speech rights by sanctioning her for using her "Facebook page as a literary device to express her emotions." Although Tatro suggests that the confidentiality standard set forth in the Minnesota statute is the only established professional conduct standard that bears any relationship to this case, the Minnesota statute that Tatro cites also provides that unprofessional conduct includes the "failure to treat" "the body of the deceased" or "the family or relatives of the deceased" "with dignity and respect." Minn.Stat. § 149A.70, subd. 7(3) (2010).[7] Accordingly, we conclude that dignity and respect for the human cadaver constitutes an established professional conduct standard for mortuary science professionals.

■ Next, we analyze the relationship between the statutory professional conduct standards and the academic program rules promulgated by the University. The University charged Tatro with violating academic program rules regulating student access to human cadavers: both general rules that require respectful treatment of human cadavers and specific laboratory rules that prohibit disrespectful, conversational language about cadaver dissection outside the laboratory and blogging about cadaver dissection or the anatomy lab.

Essentially, the University asks us to defer to "university educators to reasonably determine academic standards and rules for professional education." Although "a university's interest in academic freedom" does not "immunize the university altogether from First Amendment challenges," courts have concluded that a university "has discretion to engage in its own expressive activity of prescribing its curriculum" and that it is appropriate to "defer[ ] to the university's expertise in defining academic standards and teaching students to meet them." *Brown v. Li*, 308 F.3d 939, 950, 952 (9th Cir.2002); *see also Christian Legal Soc'y v. Martinez*, —— U.S. ——, 130 S.Ct. 2971, 2988, 177 L.Ed.2d 838 (2010) (cautioning courts "to resist 'substitut[ing] their own notions of sound educational policy' " for that of school authorities, even in areas outside of a narrow instructional context like extracurricular programs (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982))).

The academic program rules requiring respectful treatment of human cadavers are consistent with the statutory professional conduct standard requiring mortuary science professionals to treat the deceased "with dignity and respect." Minn. Stat. § 149A.70, subd. 7(3). Significantly, the academic program rules do not require respectful and discreet behavior on Facebook generally, but explicitly pertain to statements about cadaver dissection and the anatomy lab. Giving deference to the curriculum decisions of the University, we conclude that the academic program rules imposed on Tatro as a condition of her

---

**7.** Tatro does not challenge the state's authority to set professional conduct standards for mortuary science professionals and interns. Tatro also does not challenge the constitutionality of any of the statutory professional conduct standards. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075, 111 S.Ct. 2720,

115 L.Ed.2d 888 (1991) ("When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question."). Therefore, the validity and constitutionality of the state standards are not at issue here.

access to human cadavers are directly related to established professional conduct standards.

■ We also conclude that the academic program rules of the Mortuary Science Program, as applied, are narrowly tailored. In examining the academic program rules, we consider whether the University's restrictions on the mode, manner, and place of student speech are "substantially broader than necessary" to achieve the objective of ensuring that students treat human cadavers with respect and dignity. *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (holding that the government's "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"). The academic program rules allow "respectful and discreet" conversational language of cadaver dissection outside the laboratory, but prohibit blogging about cadaver dissection or the anatomy lab. In this case, the University is not sanctioning Tatro for a private conversation, but for Facebook posts that could be viewed by thousands of Facebook users and for sharing the Facebook posts with the news media. Accordingly, we conclude that the University's sanctions were grounded in narrowly tailored rules regulating widely disseminated Facebook posts.

■ Finally, we reject Tatro's argument that she did not violate any academic program rules because "[s]he merely engaged in satirical literary expression" that was "unrelated to any course work." The court of appeals concluded that the evidence supports the University's decision that Tatro violated the anatomy lab rule providing that "conversational language" about cadaver dissection should be respectful and discreet and "the overall policy requirement of treating donors with

respect and dignity." *Tatro*, 800 N.W.2d at 819. The propriety of this conclusion is not before us on appeal. Nonetheless, we observe that Tatro's Facebook posts were about the human cadaver she was dissecting in her anatomy lab course. Giving the human cadaver a name derived from a comedy film about a corpse and posting commentary about "playing" with the human cadaver, taking her "aggression" out on the human cadaver, and keeping a "[l]ock of hair" in her pocket are incompatible with the notions of respect and dignity for the individual who chose to donate his body to support the research and education missions of the Anatomy Bequest Program. Notwithstanding the claim that Tatro's "friends" would understand her sense of humor and recognize the reference to a song from one of her favorite bands, the widespread dissemination of Tatro's posts on Facebook and through the news media undermined her professional conduct obligations of respect and discretion with regard to human cadavers. And the publicity surrounding Tatro's posts resulted in letters and calls to the Anatomy Bequest Program from donor families and the public regarding Tatro's poor judgment and lack of professionalism. Therefore, we conclude that Tatro's Facebook posts violated the academic program rules of the Mortuary Science Program.

In affirming the sanctions here, we stress that the University's rules and policies governing access to human cadavers are unique because respectful treatment of human cadavers is imperative to maintaining the trust of the individuals who donate their bodies to the Anatomy Bequest Program. The University is not arguing that Tatro's controversial speech harmed the school's standing with financial supporters. As Tatro acknowledged at the CCSB hearing, there would not be a Mortuary Science Program if people were not willing to donate their bodies after death to the

Anatomy Bequest Program. Further, the consequences of any violation of trust caused by a student in the Mortuary Science Program would extend far beyond the Mortuary Science Program to other University programs that rely on donated human cadavers for their research and education missions.

Finally, we note that courts have considered the seriousness of the consequences in analyzing First Amendment claims. *See, e.g., Doninger v. Niehoff*, 527 F.3d 41, 52–53 (2d Cir.2008). In this case, Tatro was not expelled or even suspended from the Mortuary Science Program. The University allowed Tatro to continue in the Mortuary Science Program with a failing grade in one laboratory course. As amici supporting the University have argued, the First Amendment does not give Tatro a right "to engage in unprofessional and unethical conduct without any academic repercussions."

■■■ Therefore, we affirm the University's discipline of Tatro for Facebook posts that violated academic program rules governing the privilege of access to human cadavers. Our decision is based on the specific circumstances of this case—a professional program that operates under established professional conduct standards, a program that gives students access to donated human cadavers and requires a high degree of sensitivity, written academic program rules requiring the respectful treatment of human cadavers, and measured discipline that was not arbitrary or a pretext for punishing the student's protected views.

### B. *Threatening conduct.*

The parties separately address the University's imposition of discipline for Tatro's violation of the Student Conduct Code, which prohibits conduct that "endangers or threatens to endanger the health, safety, or welfare of another person." Tatro argues that the University cannot discipline her for any speech that does not constitute a "true threat" and claims that her Facebook posts do not constitute a "true threat." The University argues that it may constitutionally impose discipline for threatening speech that substantially disrupted the Mortuary Science Program.

Having concluded that the University did not violate Tatro's free speech rights by imposing sanctions for her violation of academic program rules, we do not consider the threatening speech as a stand-alone violation, particularly since the complaint and sanctions here appear to have been based on the totality of the posts. It is not evident that the University imposed separate and distinct sanctions for the threatening speech. The requirement that Tatro complete a psychiatric evaluation may have been related in part to the threatening speech, but the CCSB decision explained that Tatro's "actions were inappropriate for someone in this profession" and that "the Panel felt that it would be helpful for [Tatro] to seek professional guidance" in order "to facilitate both [her] personal and profession[al] development." Therefore, we affirm the sanctions imposed without separately addressing Tatro's threatening speech.

Affirmed.

GILDEA, C.J., PAGE, ANDERSON, PAUL H., and STRAS, JJ., took no part in the consideration or decision of this case.