**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

ESTATE OF JIMMA PAL REAT; JAMES
PAL REAT; REBECCA AWOK DIAG;
RAN PAL; CHANGKUOTH PAL;
JOSEPH KOLONG,

Plaintiffs - Appellees,

v.

JUAN JESUS RODRIGUEZ, individually,

Defendant - Appellant.

No. 15-1001

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **KELLY**, **BRISCOE**, **LUCERO**, **HARTZ**,
**GORSUCH**, **HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, McHUGH, and
**MORITZ**, Circuit Judges.
_____

This matter is before the court on the appellees' *Petition for Panel Rehearing or
Rehearing En Banc*. We also have a response from the appellant.

Upon consideration, the request for panel rehearing is granted in part and to the
extent of the changes made in the attached amended decision. The request for panel
rehearing is otherwise denied.

Both the appellees' petition and the amended panel decision were also circulated
to all the active judges of the court. A poll was called and a majority voted to deny the

request for en banc reconsideration. *See* Fed. R. App. P. 35(a). Consequently, the en banc petition is denied. Judges Lucero, Hartz, Phillips and Moritz would grant the petition for en banc rehearing.

The clerk of court is directed to file the amended panel decision effective the date of this order.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

August 12, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

ESTATE OF JIMMA PAL REAT;
JAMES PAL REAT; REBECCA
AWOK DIAG; RAN PAL;
CHANGKUOTH PAL; and JOSEPH
KOLONG,

        Plaintiffs - Appellees,

    v.

JUAN JESUS RODRIGUEZ,
individually,

        Defendant - Appellant.

No. 15-1001

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:12-CV-02531-REB-MEH)**

_____

Eric M. Ziporin (Jennifer F. Kemp with him on the briefs), Senter Goldfarb &
Rice, L.L.C., Denver, Colorado, for Appellant.

Erica Grossman (John R. Holland with her on the brief), Holland, Holland
Edwards & Grossman, P.C., Denver, Colorado, for Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **BACHARACH**, Circuit
Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

This case arises out of the fatal shooting of Jimma Pal Reat at a Denver intersection. Reat was killed after Denver 911 operator Juan Rodriguez directed him back into the path of his armed assailants. His estate sued the 911 operator, alleging civil rights claims pursuant to 42 U.S.C. § 1983 and various state law claims.

Rodriguez moved for summary judgment on all claims against him on the basis of qualified immunity. The district court granted summary judgment in his favor on all constitutional claims except for a Fourteenth Amendment substantive due process claim based on a theory of state-created danger. Under that claim, Reat's Estate contends Rodriguez used his governmental authority to subject him to the callous shooting that caused Reat's death.

We conclude the law was not clearly established such that a reasonable 911 operator would have known his conduct violated Reat's constitutional rights. Because we decide only that the law was not clearly established, we do not opine on whether Rodriguez violated Reat's constitutional rights. We therefore reverse and remand for entry of summary judgment in favor of Rodriguez.

## I. Background

The facts of this case are tragic. At 4:12 a.m. on April 1, 2012, Ran Pal called 911 to report that several men had thrown a bottle and broken the rear windshield of the car he was driving. He told Operator Rodriguez that although the attack had occurred at Tenth Avenue and Sheridan Boulevard in Denver, he

and his passengers had fled to safety in the nearby city of Wheat Ridge on the west side of Sheridan Boulevard.

For reasons that remain unclear, Rodriguez told Pal that because the attack had occurred in Denver, he needed to return to the city in order to receive help from the police. At first, Pal refused to return. He told Rodriguez he was in a state of shock, needed time to recover, and did not want to drive. Pal pleaded with Rodriguez to send help to his current location. Over the course of the fourteen-minute call, Pal told the operator at least six times that he was injured, in shock, and afraid. Still, Rodriguez insisted the police could not help unless he returned to Denver. About three minutes into the call, Pal finally agreed. He remained on the phone with Rodriguez as he drove.

On his way back to Denver, Pal fleshed out the details of the assault on the call. He explained that he, his brother, cousin, and a friend had been driving through Denver when a red jeep pulled up next to them. While both cars were stopped at a red light, the men in the jeep threw bottles and bottle rockets at Pal's car, breaking the windshield. Shards of glass injured Pal's hand and face. He told Rodriguez he had gotten a partial license plate number as the assailants sped off northbound on Sheridan Boulevard. Pal continued to tell the operator he was in shock. Rodriguez asked where Pal was, and Pal replied that he was crossing Sheridan on Twenty-Ninth Avenue. Rodriguez instructed him to stop there, and

continued to ask questions to determine whether an ambulance was necessary. Rodriguez failed to dispatch an ambulance or the police at this time.

About eight minutes into the call, Pal revealed to Rodriguez that the assailants had brandished a gun. Rodriguez asked questions about the size, color, and type of gun. He also asked more questions about the attackers, including their race and what they had been wearing. Pal told the operator that four or five Hispanic men had gotten out of the car and hurled forty-ounce beer bottles at his vehicle. He told Rodriguez he had fled the scene when his brother urged him to do so because the attackers were armed. After questioning the victims about whether they had been drinking, Rodriguez confirmed that Pal was still at Twenty-Ninth Avenue and Sheridan Boulevard. He told Pal to pull over and wait there for the officers whom he would dispatch. Rodriguez also instructed Pal to turn on his hazard lights so that the police could easily locate the vehicle.

About ten minutes into the call, another man in the car picked up the phone. The man repeated that they were all in shock and scared, and asked whether police were on their way to provide help. Though Rodriguez indicated he had sent the police, he in fact had not. Rodriguez asked that the phone be handed back to Pal. Rodriguez then had Pal confirm that his hazard lights were on, and reiterated that Pal needed to wait at that location. He warned Pal, "if you see them come back, I need you to call us right away at 911." Aplt. App., Vol. III, at 281.

Seven seconds later, Pal shouted, "They're back, they're back[!]" *Id.* at 262. Pal handed the phone to someone else, who told Rodriguez that the men were shooting. Pal picked the phone back up to report that his brother had been shot. Over Pal's screams, Rodriguez continued to ask what was happening. Someone else picked up the phone and repeated the information. Rodriguez asked who had been shot, where they were located, and whether the attackers were still there. The speaker told Rodriguez that Reat was about to die and asked whether he could send an ambulance. Rodriguez continued to ask questions about the victim. Officers were dispatched to the scene about one minute after the shooting. Reat died of his injuries.

## II.  Analysis

Reat's Estate brought federal claims pursuant to 42 U.S.C. § 1983 and various state law claims against Rodriguez and the City and County of Denver. The defendants claimed they were protected by qualified immunity, arguing they did not violate Reat's rights under clearly established law. The district court dismissed the claims against the City and County. Only claims against Rodriguez proceeded.

### A.  *Qualified Immunity*

#### 1.  *Clearly Established Law*

Qualified immunity exists to protect government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity is not only a defense to liability, but immunity from suit; thus, "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Accordingly, in qualified immunity cases at the summary judgment stage, a "plaintiff must demonstrate on the facts alleged (1) that the defendant violated his constitutional or statutory rights, and (2) that the constitutional right was clearly established at the time of the alleged unlawful activity." *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009). In our review, "we need only find that the plaintiffs failed either requirement" to establish qualified immunity. *Id.* Because there are cases where we can more readily decide the law was not clearly established before reaching the more difficult question of whether there has been a constitutional violation, we may exercise discretion in deciding which prong to address first. *See Pearson*, 555 U.S. at 236.

This is such a case. We therefore confine our analysis of qualified immunity to the second prong, inquiring only whether the law at the time of the incident was "sufficiently clear that a reasonable official would have understood that his conduct violated the right." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). A right is clearly established when it is "sufficiently clear that every

reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alteration omitted). To make this determination, we consider "either if courts have previously ruled that *materially similar conduct* was unconstitutional, or if a general constitutional rule already identified in the decisional law [applies] with *obvious clarity* to the specific conduct at issue." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008) (emphasis added). Usually, this requires either "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cordova v. City of Albuquerque*, 816 F.3d 645, 658 (10th Cir. 2016) (quoting *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010)).

But an earlier decision need not be "materially factually similar or identical to the present case; instead, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). We look to see if "existing precedent . . . placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The dispositive question is whether the violative nature of *particular* conduct is clearly established," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original) (internal quotation marks omitted), so that "it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted," *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  This investigation must be undertaken with a focus on the particular circumstances of the specific case before the court.

In sum, plaintiffs must "demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited."  *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000)).

### 2.  *State-Created Danger*

The Estate argues that Rodriguez created the danger that led to Reat's death. At the most general level, the parties agree that the state-created danger doctrine is clearly established in this circuit.

Two preconditions are necessary for the application of the state-created danger doctrine: first, the state actor took an affirmative action, and, second, that action led to private violence injuring the plaintiff.  *Id.* at 1105.  If these preconditions are met, a plaintiff next must show:

> (1) the charged state . . . actor[] created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

-8-

*Id.*

Though the elements of the state-created danger test are clearly established, it also must be clear to which fact scenarios and government actors we apply the test, and what types of conduct are "conscience shocking" under the sixth factor. *Green v. Post*, 574 F.3d 1294, 1297 (10th Cir. 2009) (conscience-shocking conduct is "difficult to define and requires an assessment of the totality of the circumstances of each particular case" (internal quotation marks omitted)). But, as we explained above, the application of an established test even to a new fact pattern does not necessarily require a finding of qualified immunity. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

Here, Reat's Estate alleges Rodriguez violated the Fourteenth Amendment by knowingly sending the victims, who had called 911 to report an assault, back into the path of their armed attackers. It contends Rodriguez knew the attackers last had been seen speeding northward on Sheridan Boulevard only minutes earlier, yet he instructed Pal to stop on that road. He then told Pal to pull over and activate his hazard lights at a location nineteen blocks north of the place of the assault. Even after Rodriguez knew the attackers had brandished a gun, he did not suggest that Pal relocate to a less conspicuous place, nor did he send police protection. The district court held "these factual allegations, accepted as true, are sufficiently shocking to the conscience to state a plausible claim for violation of

plaintiffs' substantive due process rights under the state-created danger theory."

Aplt. App., Vol. V., at 575.

For a number of reasons, we conclude Rodriguez's conduct does not violate the clearly defined contours of the state-created danger doctrine. First, Reat's Estate cannot point to a Supreme Court or Tenth Circuit case involving misconduct by 911 operators. As a general matter, we have considered the doctrine in a number of cases involving a range of state actors. For example, we have analyzed the doctrine in the context of both an off-duty police officer on personal business who crashed his police vehicle, *see Browder v. City of Albuquerque*, 787 F.3d 1076, 1083 (10th Cir. 2015), and on-duty officers engaged in high-speed chases where "the legitimate governmental objective is so pressing that the luxury of forethought doesn't exist," *id.* at 1080; *see also Sacramento Cty. v. Lewis*, 523 U.S. 833 (1998). We have also applied this theory of liability to other types of first responders, cloaked with government authority, reacting immediately to emergency situations. *See, e.g.*, *Perez v. Unified Gov't of Wyandotte Cty./Kansas City*, 432 F.3d 1163, 1168 (10th Cir. 2005) (applying the state-created danger doctrine to a firefighter who crashed his truck into a car, killing its occupant); *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (applying the doctrine to a deputy sheriff who caused the death of a bystander by instructing him to help physically subdue a suspect who then shot the civilian).

In other settings, we have applied the state-created danger doctrine to social workers, school officials, and hospital administrators. *See, e.g.*, *Currier*, 242 F.3d at 908 (applying the doctrine to social worker who removed a child from his mother's home and placed him with his father, who killed him); *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253 (10th Cir. 1998) (applying the doctrine to school official who suspended and sent home a special education student who subsequently killed himself); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995) (applying the doctrine to state mental health administrators who eliminated a special unit for the criminally insane, causing the transfer of a murderer to the general hospital, where he killed his therapist).

But these cases are not particularly instructive here: as the Supreme Court noted in the case that is widely understood to be the progenitor of the state-created danger doctrine, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Deshaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989). In all of these cases where we found it appropriate to apply the doctrine of state-created danger, the victims were unable to care for themselves or had had limitations imposed on their freedom by state actors. "[In a] custodial situation [such as] a prison, forethought about an inmate's welfare is not only feasible but

-11-

obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis*, 523 U.S. at 851.

Rodriguez is unlike any of the defendants in our state-created danger cases. Rodriguez was not a police officer, firefighter, or other similar first responder.[1] As a 911 operator, he was not present at the scene of the attack, nor could he take physical action in response to the unfolding event. He did not impose any limitation on Reat's freedom to act. Rodriguez merely informed the victims, however incompetently, that to get help from the police, they would have to return to Denver. It cannot be said that any of Rodriguez's actions, as foolish as they were, "limited in some way the liberty of a citizen to act on his own behalf." *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994).

Furthermore, Reat is unlike the victims in other state-created danger cases. He was not in the custody of the state in the way that prisoners are, and thus was not deprived in that manner of his freedom to act. Unlike children in school or under the care of social workers, Reat and his companions were not incapable of acting in their own interest at the time of the shooting. Though the state-created danger doctrine itself may be clearly established, it is far from clear that it applies to Rodriguez's conduct in this particular situation.

---

[1] Only one circuit court has even considered imposing liability under the state-created danger doctrine on a 911 operator for conduct responding to an emergency call. *See Beltran v. City of El Paso*, 367 F.3d 299 (5th Cir. 2004) (finding operator was entitled to qualified immunity where she miscoded a 911 call, leading to the death of the child caller and her mother).

In sum, all cases cited by Reat's Estate "are simply too factually distinct to speak clearly to the specific circumstances here." *Mullenix*, 136 S. Ct. at 312. No reasonable 911 operator could have known that these actions would have resulted in liability under the Fourteenth Amendment. Because we dispose of this case on the clearly-established prong of the qualified immunity test, we express no opinion as to whether Rodriguez's actions violated Reat's constitutional rights. Thus, our decision does not foreclose liability for similarly-situated actors in future cases. *See Pearson*, 555 U.S. at 242–43.

### B. State Law Claims

Reat's Estate also asks us to exercise supplemental jurisdiction over related state law claims against Rodriguez. When we have held defendants are entitled to summary judgment on all federal claims, we have declined to exercise our supplemental jurisdiction over issues of state law, and instead, when in the interests of comity and justice, remanded with instructions to dismiss. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1229–30 (10th Cir. 2010); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). Accordingly, we decline to exercise jurisdiction over the remaining state law claims.

## III. Conclusion

For the foregoing reasons, we REVERSE AND REMAND with instructions to DISMISS without prejudice the state law claims.