**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

PAUL HUNT,

     Plaintiff - Appellant,

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO;
SCOTT CARROLL, M.D., in his
individual and official capacities; JOHN
DOE; JANE DOE, Members of the
Committee for Student Promotion and
Evaluation, in their individual and official
capacities; TERESA A. VIGIL, M.D., in
her individual and official capacities;
PAUL ROTH, M.D., in his individual and
official capacities,

     Defendants - Appellees.

-----------------------------------------------------

ELECTRONIC FRONTIER
FOUNDATION; THE JOSEPH L.
BRECHNER CENTER FOR FREEDOM
OF INFORMATION; STUDENT PRESS
LAW CENTER; THE NATIONAL
COALITION AGAINST CENSORSHIP;
FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION; CATO
INSTITUTE; PROFESSOR EUGENE
VOLOKH,

     Amici Curiae.

_____

No. 18-2149
(D.C. No. 1:16-CV-00272-JCH-KK)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

_____

Before **HOLMES**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

_____

Paul Hunt filed this 42 U.S.C. § 1983 action against the Board of Regents of the University of New Mexico (UNM) and various administrators at the University of New Mexico School of Medicine (UNMSOM), claiming violations of his free speech rights under the First Amendment and his due process rights under the Fourteenth Amendment. The district court granted summary judgment for the defendants. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.[1]

## BACKGROUND

In 2012, as a medical student at UNMSOM, Mr. Hunt was subject to the policies of both UNM and UNMSOM, including UNM's Respectful Campus Policy and UNMSOM's Social Media Policy. The Respectful Campus Policy noted, _inter alia_, that (1) "UNM strives to foster an environment that reflects courtesy, civility,

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] We previously entered an order provisionally granting motions for leave to file amicus curiae briefs by (1) the Joseph L. Brechner Center for Freedom of Information, the Student Press Law Center, the Electronic Frontier Foundation, and the National Coalition Against Censorship; and (2) the Foundation for Individual Rights in Education, the Cato Institute, and Professor Eugene Volokh. We now make permanent the provisional order and grant the amici's motions.

and respectful communication because such an environment promotes learning, research, and productivity"; and (2) "a respectful campus environment"—that is, one that "exhibits and promotes" professionalism, integrity, harmony, and accountability—is "a necessary condition for success in teaching and learning, in research and scholarship, in patient care and public service, and in all other aspects of the University's mission and values." Aplt. App. at 42. The Social Media Policy addressed the use of "sites like Facebook" and cautioned students, *inter alia*, to: (1) "[e]xercise discretion, thoughtfulness and respect for your colleagues, associates and the university's supporters/community"; and (2) "[r]efrain from engaging in dialogue that could disparage colleagues, competitors, or critics." *Id.* at 41.

Shortly after the presidential election in November 2012, Mr. Hunt, then twenty-four years old, posted the following comment on his personal Facebook page:

> All right, I've had it. To all of you who support the Democratic candidates:
>
> The Republican Party sucks. But guess what. Your party and your candidates parade their depraved belief in legal child murder around with pride.
>
> Disgusting, immoral, and horrific. Don't celebrate Obama's victory tonight, you sick, disgusting people. You're abhorrent.
>
> Shame on you for supporting the genocide against the unborn. If you think gay marriage or the economy or taxes or whatever else is more important than this, you're fucking ridiculous.
>
> You're WORSE than the Germans during WW2. Many of them acted from honest patriotism. Many of them turned a blind eye to the genocide against the Jews. But you're celebrating it. Supporting it. Proudly proclaiming it. You are a disgrace to the name of human.

3

So, sincerely, fuck you, Moloch worshiping assholes.

*Id.* at 37-38.

On November 15, 2012, Scott Carroll, MD, Chair of UNMSOM's Committee on Student Promotions and Evaluation (CSPE), sent a letter to Mr. Hunt, stating the Dean of Students was referring him to CSPE due to alleged unprofessional conduct relating to the Facebook post. Dr. Carroll stated that Mr. Hunt had "every right to [his] political and moral opinions and beliefs" but that "there is still a professionalism standard that must be maintained as a member of the UNM medical school community." *Id.* at 93. He then quoted the following excerpt from UNM's Respectful Campus Policy:

> Individuals at all levels are allowed to discuss issues of concern in an open and honest manner, without fear of reprisal or retaliation from individuals above or below them in the university's hierarchy. At the same time, the right to address issues of concern does not grant individuals license to make untrue allegations, **unduly inflammatory statements or unduly personal attacks, or to harass others**, to violate confidentiality requirements, or engage in other conduct that violates the law or the University policy.

*Id.* (emphasis in original) (italics and internal quotation marks omitted). After noting this policy "applied to communication through social media outlets such as Facebook[,] as stated in the UNMSOM Social Media Policy," he quoted from the latter: "UNMSOM does not routinely monitor personal websites or social media outlets" but "any issues that violate any established UNM Policy will be addressed," and "[v]iolation of this or any UNM policy may result in disciplinary action, up to and including dismissal from UNM." *Id.* (italics and internal quotation marks

4

omitted). Finally, the letter stated that CSPE would address "the allegations at its November 20th meeting" and that Mr. Hunt should "prepare a statement . . . and be prepared to answer questions from the committee members." *Id.*

At the CSPE meeting, Mr. Hunt (1) read a statement "acknowledging [his] 'guilt' and asking CSPE for help to overcome [his] 'deficiencies'"; and (2) responded to questions from CSPE members. *Id.* at 88.

Two months later, Dr. Carroll informed Mr. Hunt that CSPE found the Facebook post violated the policies at issue and was imposing "a professionalism enhancement prescription" consisting of an ethics component and a professionalism component, each with different faculty mentors. *Id.* at 95. For the ethics component, the mentor would "assign readings and supervise a reflective writing assignment on patient autonomy and tolerance." *Id.* The professionalism component entailed: (1) a writing assignment on the public expression of political beliefs by physicians; (2) an apology letter that Mr. Hunt could present to his "classmates, select individuals or no one"; (3) rewriting the Facebook post in a passionate yet professional manner; and (4) regular meetings with the faculty mentor over the course of a one-year period. *Id.* CSPE would need to approve final written products. *Id.*

Dr. Carroll also explained that the professionalism violation would be noted in the Dean's recommendation letter for Mr. Hunt's residency applications, but that he could "choose to petition CSPE to remove the notation at some point in the future." *Id.* Dr. Carroll cautioned Mr. Hunt that (1) "any further professionalism lapses will result in referral to CSPE and may result in adverse action such as dismissal"; and

5

(2) failure to fulfill the requirements of the professionalism prescription could result in "adverse action including dismissal." *Id.* at 95-96. The letter concluded by noting Mr. Hunt had the right to "request review by the Senior Associate Dean of Education" if he believed CSPE's decision was "fundamentally flawed, unfair or otherwise inappropriate." *Id.* at 96 (italics and internal quotation marks omitted).

Mr. Hunt did not seek such review. Rather, over the following year, he worked toward satisfying his professionalism prescription, meeting with his mentors and completing the written assignments. Mr. Hunt alleged that either CSPE or his mentor did not approve his first drafts but ultimately approved his second attempts. And in his revised Facebook post, Mr. Hunt "still expresse[d] [his] fervent opposition to abortion" but in a "calm and rational" tone and with "no expletives." *Id.* at 125.

On April 22, 2014, Dr. Carroll informed Mr. Hunt that he had satisfied the professionalism prescription but cautioned that any future professionalism issues would "be considered in light of [his] previous lapse in professionalism." *Id.* at 100. Dr. Carroll also reminded Mr. Hunt of the need to request removal of the notation from his Dean's letter and "suggest[ed] waiting until toward the end of Phase II" but before "the summer before the 4th year of medical school, early in Phase III." *Id.* Mr. Hunt anticipated completing Phase II "on or about April 30, 2017." *Id.* at 17.

In January 2016, Mr. Hunt filed suit in state court against UNM's Board of Regents, Dr. Carroll, members of CSPE, and UNMSOM's Dean, raising claims under the First and Fourteenth Amendments and seeking monetary damages and injunctive and declaratory relief. The defendants removed the case to federal court under

6

28 U.S.C. § 1331 and filed a motion to dismiss or for summary judgment. The district court granted summary judgment for the defendants. In particular, the court: (1) dismissed the claims for damages against the individual defendants in their official capacities and the Board because they were not subject to suit under § 1983; (2) found the individual defendants were entitled to qualified immunity on Mr. Hunt's free speech claims because there was no clearly established law prohibiting the defendants' conduct; and (3) found the individual defendants were entitled to qualified immunity on Mr. Hunt's due process claim because the defendants' conduct was not unconstitutional. Mr. Hunt timely appealed.

## DISCUSSION

The sole issues properly before this court are whether, in addressing the defendants' qualified immunity defense to Mr. Hunt's free speech claims, the district court erred by (1) declining to address the constitutionality of the defendants' actions; and (2) determining the law was not clearly established.[2]

---

[2] We do not consider Mr. Hunt's due process claim because he did not address it on appeal. *See Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997). We also decline to address the argument by Mr. Hunt and the amici that the governing policies were unconstitutionally vague and overbroad. As Mr. Hunt conceded in his opening brief, "he did not fully brief these arguments" in district court. Aplt. Opening Br. at 6. He attempted to retract this concession in his reply brief by quoting from his complaint and response to the summary judgment motion, but (1) the content or context of the quoted passages plainly demonstrates they concerned either his as-applied free speech claims or his due process claim, not a facial challenge to the policies themselves; and (2) he did not raise a First Amendment facial challenge in his complaint. While we may consider an issue raised for the first time on appeal, "the decision regarding what issues are appropriate to entertain . . . in instances of lack of preservation is discretionary." *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013). Because the resolution of this issue is

7

## A. Standard of Review

This court "review[s] summary judgment decisions de novo," "view[ing] the evidence and draw[ing] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Talley v. Time, Inc.*, 923 F.3d 878, 893 (10th Cir. 2019) (internal quotation marks omitted). Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To overcome a qualified immunity defense at the summary judgment phase, a plaintiff must show: "(1) that the defendant violated his constitutional . . . right[], and (2) that the constitutional right was clearly established at the time of the alleged unlawful activity." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016) (internal quotation marks omitted). Failure on either prong "is fatal to the plaintiff's cause." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018) (internal quotation marks omitted).

---

not "beyond doubt" and does not involve "unusual circumstances," *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 721 (10th Cir. 1993), we decline to exercise our discretion to consider it. Finally, we decline to address any issues raised by the amici but not by Mr. Hunt, such as a compelled speech claim. *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1230 n.6 (10th Cir. 2009) (declining to address a compelled speech argument raised in an amicus brief).

## B. First Prong

Mr. Hunt and the amici contend that (1) the district court should have addressed the first prong of qualified immunity; and (2) this court should address the first prong. But the Supreme Court has afforded both district courts and courts of appeals the discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Indeed, the Supreme Court has admonished courts to "think hard, and then think hard again, before" addressing both prongs of qualified immunity. *Camreta v. Greene*, 563 U.S. 692, 707 (2011). And we have found addressing both prongs "should be the exception" because of the doctrine of constitutional avoidance. *Kerns*, 663 F.3d at 1180-81 (internal quotation marks omitted).

Off-campus, online speech by university students, particularly those in professional schools, involves an emerging area of constitutional law. *See, e.g.*, *Keefe v. Adams*, 840 F.3d 523, 529-33 (8th Cir. 2016) (finding no First Amendment violation when a student was suspended from a nursing program at a public college for "on-line, off-campus Facebook postings" that the school deemed unprofessional and in violation of governing codes of conduct), *cert. denied*, 137 S. Ct. 1448 (2017). Accordingly, we find no fault with the district court's exercise of its discretion. And we, too, decline Mr. Hunt's request to address the first prong.

9

## C. Second Prong

In confining its review to the second prong of the qualified immunity analysis, the district court determined that the law was not clearly established and that defendants, therefore, were entitled to qualified immunity. We agree.

"A right is clearly established when," based upon "the law at the time of the incident," "it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Estate of Reat*, 824 F.3d at 964 (internal quotation marks omitted). Because "qualified immunity protects all officials except those who are plainly incompetent or those who knowingly violate the law," *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) (internal quotation marks omitted), "existing precedent must have placed the . . . constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks and citation omitted).

"To make this determination, we consider either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue." *Estate of Reat*, 824 F.3d at 964-65 (internal quotation marks, emphases, and alteration omitted). "[A] plaintiff may satisfy this

10

standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (internal quotation marks omitted). "[C]learly established law should not be defined at a high level of generality" but, instead, "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (alterations and internal quotation marks omitted).

Here, we are faced with a medical student's free speech challenge to sanctions from his school in response to his off-campus, online speech. Based upon the case law as of 2012-2013, which the parties agree is the relevant time period, we cannot say that "every reasonable official" in the position of the defendants here would have known their actions violated the First Amendment. *Estate of Reat*, 824 F.3d at 964 (internal quotation marks omitted).

The Supreme Court first examined whether a high school could prevent students from wearing arm bands on campus to protest the Vietnam War. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). The Court noted students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but recognized the rights must be "applied in light of the special characteristics of the school environment." *Id.* at 506. In a divided opinion, the

11

Court held that schools can regulate speech that "would materially and substantially disrupt the work and discipline of the school," *id.* at 513, or that intrudes upon "the rights of other students," *id.* at 508. The Court concluded that the school could not prohibit the students' "silent, passive expression of opinion, unaccompanied by any disorder or disturbance," *id.* at 508, 514. Although the holding encompassed speech occurring "in class or out of it," *id.* at 513, it is clear *Tinker* addressed on-campus speech only, *see id.* at 512-13 (discussing speech "in the classroom" and also "in the cafeteria, or on the playing field, or on the campus during the authorized hours").

Three years later, the Court extended *Tinker* to the university setting, although that case concerned official recognition of a student group and not student discipline. *See Healy v. James*, 408 U.S. 169, 180, 189 (1972). The Court noted: (1) "state colleges and universities are not enclaves immune from the sweep of the First Amendment"; and (2) "First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." *Id.* at 180 (quoting *Tinker*, 393 U.S. at 506). *Healy* acknowledged a college may "expect that its students adhere to generally accepted standards of conduct," *id.* at 192 (internal quotation marks omitted), but it rejected the notion that "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large," *id.* at 180.

After *Healy*, the Court addressed a free speech claim by a graduate-level journalism student expelled under a policy prohibiting "indecent . . . speech" for distributing on campus an underground newspaper containing: (1) "a political

12

cartoon . . . depicting policemen raping the Statute of Liberty and the Goddess of Justice"; and (2) "an article entitled 'M----- f----- Acquitted,'" referring to an assault trial. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 667-68 (1973) (per curiam). After reiterating public colleges are not immune from the First Amendment, the Court, echoing *Tinker*, explained "in the absence of any disruption of campus order or interference with the rights of others, the sole issue was whether a state university could proscribe this form of expression." *Id.* at 670 & n.6. A divided Court held "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670.

After *Papish*, the Court seemingly tacked in a different direction. First, in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 677-78 (1986), the Court addressed a free speech challenge by a student who was suspended after giving a speech in which he described another student with "an elaborate, graphic, and explicit sexual metaphor." Chief Justice Burger, who dissented in *Papish*, authored the majority opinion, which observed that schools have a responsibility to teach "the shared values of a civilized social order," *id.* at 683, including that "the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences," *id.* at 681. Finding "especially relevant" the contention in the *Tinker* dissent that schools need not "surrender control" to their students, *id.* at 686 (internal quotation marks omitted), the Court

13

held that schools may restrict on-campus speech that is "lewd," "vulgar," or "indecent," even absent any disruption, *id.* at 685.

Two years later, the Court rejected a claim by high school students that their school violated the First Amendment by censoring articles about pregnancy and divorce from the school newspaper. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 262-73 (1988). After finding "equally relevant" the portion of the *Tinker* dissent quoted in *Fraser*, *id.* at 271 n.4, the Court expressly refused to apply *Tinker*, *see id.* at 272-73. Instead, the Court held that schools may regulate "student speech in school-sponsored expressive activities," which "members of the public might reasonably perceive to bear the imprimatur of the school," "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273. The Court declined to decide whether the rule applied at universities. *Id.* at 273 n.7.

Lastly, in *Morse*, the Court rejected a free speech claim by a student who was suspended for waving a banner that read "BONG HiTS 4 JESUS" at an off-campus, school-approved activity. *Morse v. Frederick*, 551 U.S. 393, 396-98 (2007). In a 5-4 decision, the Court held: (1) "*Tinker* is not the only basis for restricting student speech," *id.* at 406; (2) the speech in *Fraser* "would have been protected" had it been "outside the school context," *id.* at 405; and (3) a school may "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use," *id.* at 402.

Like the Supreme Court, our student speech cases mainly concern on-campus speech by K-12 students.[3] We have extended *Hazelwood* to "speech that occurs in a [university] classroom as part of a class curriculum." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004); *see, e.g.*, *Pompeo v. Bd. of Regents of the Univ. of N.M.*, 852 F.3d 973, 988-90 (10th Cir. 2017) (upholding qualified immunity where a university student was "chastised" and told to rewrite a paper after "using inflammatory language" in an assignment). But we have not yet decided whether *Hazelwood* applies to "university students' extracurricular speech," *Axson-Flynn*, 356 F.3d at 1286 n.6, or non-curricular speech.

Mr. Hunt insists that because *Fraser*, *Hazelwood*, and *Morse* do not apply, "*Tinker* is the applicable standard," Aplt. Opening Br. at 18, and establishes that his

---

[3] *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35, 38 (10th Cir. 2013) (finding no free-speech violation under *Tinker* where the school prohibited the distribution of rubber fetus dolls based on a "strong potential for substantial disruption"); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1222, 1228 (10th Cir. 2009) (finding no violation under *Hazelwood* where the school required a student, in order to receive her diploma, to apologize for discussing her religious views during her valedictory speech, explaining that "discipline, courtesy, and respect for authority" constitute legitimate pedagogical goals (internal quotation marks omitted)); *Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 922, 934 (10th Cir. 2002) (finding no violation under *Hazelwood* where the school allowed students to decorate memorial tiles but prohibited "religious symbols, the date of the shooting, or anything obscene or offensive"); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (finding no violation under *Tinker* where the school prohibited the display of the Confederate flag because it "might cause disruption and interfere with the rights of other students to be secure and let alone"); *Seamons v. Snow*, 84 F.3d 1226, 1237-38 (10th Cir. 1996) (holding the student properly stated a free speech claim where the school denied him "the ability to report physical assaults in the locker room," finding that the school's "fear of a disturbance stemming from the disapproval associated with [the student's] unpopular viewpoint regarding hazing in the school's locker rooms" was insufficient under *Tinker*).

"right to free speech was violated," *id.* at 21. However, in *Morse*, Justice Thomas observed the Court has not "offer[ed] an explanation of when [*Tinker*] operates and when it does not," *Morse*, 551 U.S. at 418 (Thomas, J., concurring), and the majority itself acknowledged "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents," *id.* at 401.

For example, it is inescapable that *Tinker* and its progeny involved speech occurring on campus or as part of a school-sanctioned activity. *See Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008) ("The Supreme Court has yet to speak on the scope of a school's authority to regulate expression that . . . does not occur on school grounds or at a school-sponsored event."). Additionally, none of the Court's cases involved online speech. *See* Aplt. Opening Br. at 21 (conceding the Court has not "specifically addressed the scope of the [F]irst [A]mendment rights of a university student's off-campus social media speech"). The Court held in 1997 that the First Amendment applied to the Internet, *see Reno v. ACLU*, 521 U.S. 844, 849 (1997), but it only recently addressed its application to social media, *see Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). Unsurprisingly, "[a] growing body of scholarship [has] call[ed] for the Supreme Court to take a case applying its school speech doctrine to a student's online speech." Elizabeth Nicoll, *University Student Speech and the Internet: A Clusterf\*\*\**, 47 NEW ENG. L. REV. 397, 397 (2012). But as the Court has not taken such a case, "First Amendment doctrine" "[a]t the intersection of university speech and social media" remains "unsettled." *Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018) (concluding the law was not clearly

16

established for a free speech claim by a student expelled for off-campus, online speech that violated the university's code of conduct and sexual-harassment policy).[4]

Moreover, though at first blush they might appear favorable to Mr. Hunt, even viewed in isolation, the Supreme Court's university cases of *Healy* and *Papish* fail to supply clearly established law. *Healy* reiterated *Tinker*'s warning that "First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." *Healy*, 408 U.S. at 180 (quoting *Tinker*, 393 U.S. at 503). *Healy* also acknowledged a college may "expect that its students adhere to generally accepted standards of conduct." *Id.* at 192 (internal quotation marks omitted). Requiring a graduate student to meet standards of professionalism that would be expected of him upon his entry into the profession is quite different from restricting speech solely because of a generalized "need for order," *Healy*, 408 U.S. at 180, or "in the name alone of 'conventions of decency,'" *Papish*, 410 U.S. at 670. *Healy* and *Papish* appear to leave space for administrators to operate as the circumstances demand when confronted with speech by students in professional schools that appears to be at odds with customary professional standards. And neither decision would have sent sufficiently clear signals to reasonable medical school administrators that sanctioning a student's off-campus, online speech for the purpose of instilling professional norms is unconstitutional.

---

[4] We cite *Yeasin*, an unpublished case, for its persuasive value. Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

17

Nor has Mr. Hunt shown that the clearly established weight of authority from other circuits supports his position. Mr. Hunt relies on a 2015 case which noted that five out "'of the six circuits to have addressed whether *Tinker* applies to off-campus speech . . . have held it does.'" Aplt. Opening Br. at 24 (quoting *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 393 (5th Cir. 2015) (en banc)). However, even though *Bell* identified pre-2012 circuit precedent (including from the Fifth), it is notable that its analysis revealed a circuit split, 799 F.3d at 393, which belies a suggestion of clearly established law. "If judges disagree on a constitutional question, it is unfair to subject [public officials] to money damages for picking the losing side of the controversy." *Poolaw v. Marcantel*, 565 F.3d 721, 741 (10th Cir. 2009) (internal quotation marks and ellipsis omitted).

Several decisions from the Third Circuit highlight the lack of clarity at the time of the defendants' actions at issue. In 2010, that court found that "[p]ublic universities have significantly less leeway in regulating student speech than public elementary or high schools," but admitted that: (1) "it [was] difficult to explain how this principle should be applied in practice"; (2) "it [was] unlikely that any broad categorical rules will emerge from its application"; and (3) "[a]t a minimum, the teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 247 (3d Cir. 2010).

That court issued two decisions a year later that failed to bring definiteness to this area of the law. *See J.S. ex rel. Snyder v. Blue Mtn. Sch. Dist.*, 650 F.3d 915,

18

920-31 (3d Cir. 2011) (en banc) (concluding a middle school could not punish a student for creating on her home computer a MySpace profile that mocked her principal, noting the student took steps to make the profile private and the school could not have reasonably forecast a disruption); *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 207-19 (3d Cir. 2011) (en banc) (concluding a high school could not punish a student for a parody MySpace profile of his principal that he created off campus but later accessed on campus). The opinions found in favor of the students but revealed a deep division over whether *Tinker* applies off-campus, with six judges saying it should, *Snyder*, 650 F.3d at 943 (Fisher, J., dissenting), five disagreeing, *id.* at 940 (Smith, J., concurring), and others insisting the "off-campus versus on-campus distinction is artificial and untenable in the world we live in today," *Layshock*, 650 F.3d at 220 (Jordan, J., concurring) (internal quotation marks omitted). Two judges feared the cases could "send an 'anything goes' signal to students, faculties, and administrators of public schools." *Layshock*, 650 F.3d at 222 (Jordan, J., concurring).

Mr. Hunt's Facebook post also occurred months after a state high court found a university had not violated a mortuary science student's free speech rights when it imposed sanctions, including a writing assignment, in response to Facebook posts the school deemed, *inter alia*, unprofessional. *Tatro v. Univ. of Minn.*, 816 N.W.2d 509, 511-24 (Minn. 2012). Upholding the discipline, the court held "a university may regulate student speech on Facebook that violates established professional conduct

19

standards," provided "any restrictions . . . [are] narrowly tailored and directly related to established professional conduct standards." *Id.* at 521.

Against this backdrop, we conclude that the Supreme Court's K-12 cases of *Tinker*, *Fraser*, *Hazelwood*, and *Morse* and its university cases of *Papish* and *Healy* fail to supply the requisite on-point precedent. Moreover, decisions from our court and other circuits have not bridged the unmistakable gaps in the case law, including whether: (1) *Tinker* applies off campus; (2) the on-campus/off-campus distinction applies to online speech; and (3) *Tinker* provides an appropriate framework for speech by students in graduate-level professional programs, such as medical schools, *cf. Salehpoor v. Shahinpoor*, 358 F.3d 782, 787 & n.5 (10th Cir. 2004) (applying the public-employee analysis to speech by a graduate-level engineering student).

In the end, Mr. Hunt has "failed to identify a case where [a medical school administrator] acting under similar circumstances as [the defendants in this case] was held to have violated the [First] Amendment." *Pauly*, 137 S. Ct. at 552. Mr. Hunt and the amici have provided a patchwork of cases connected by broad legal principles, but the law in late 2012 and 2013 would not have given the defendants notice that their response to the Facebook post was unconstitutional. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Accordingly, the defendants were entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, the district court's order is affirmed.

Entered for the Court

Jerome A. Holmes
Circuit Judge